THE INTER-STATE NATIONAL BANK V. J. W.
RINGO et al.

No. 14,070.     (83 Pac. 119.)

SYLLABUS BY THE COURT.

1. NEGOTIABLE INSTRUMENTS—*Note Exchanged for Worthless
   Check—Erroneous Credit—Recaption of Note—Payment.* A
   bank holding a note for collection delivered it to an indorser
   on the day of maturity in exchange for the indorser's check
   upon another bank, and after inquiring by telephone of the
   drawee bank about the check and being told, through a mis-
   take as to what check was meant, that it would be paid, en-
   tered the amount to the credit of the owner of the note. On
   the next day payment of the check, which at no time was
   good, was refused for want of funds, and the collecting bank
   delivered it to the drawer and in return received the note of
   its principal. *Held,* that these transactions did not effect the
   payment of the note.

2. BANKS AND BANKING—*Note Held for Collection—Surren-
   dered and Regained without Prejudice—Liability of Bank.*
   Where a bank holding a note for collection surrendered it to
   the maker in exchange for his worthless check upon another
   bank, but upon the dishonor of the check regained possession
   of the note as a subsisting obligation against all makers and
   indorsers, and no actual prejudice resulted to the owner
   from the transaction, which took place after the close of
   banking hours upon one day and before their opening on
   the next, no liability was thereby created against the col-
   lecting bank in favor of the owner of the note.

3. ———— *Effect of Erroneous Credit Given to Owner of the
   Note.* Under the circumstances stated in the preceding para-
   graph no liability against the collecting bank arose from the
   further facts that, upon being orally promised payment by
   the bank on which the check was drawn, it gave the owner
   of the note credit on its books for the amount and mailed to
   him a statement to that effect, adding that the credit was
   subject to collection, notice of the non-payment of the check
   having been given to the owner of the note by telephone
   early in the morning of the next day.

4. ———— *Amount of Check Charged against Deposit of Drawee
   Bank.* Under the circumstances stated in the two preceding
   paragraphs no liability against the collecting bank arose
   from the further fact that, having on deposit funds of the

bank on which the check was drawn, it charged the amount of the check against such deposit and refused to pay it out until indemnified against loss in so doing.

Error from Wyandotte district court; E. L. FISCHER, judge. Opinion filed November 11, 1905. Reversed.

## STATEMENT.

RINGO & ASKEW, residing in Oklahoma, gave their note for $10,209.63 to Ladd, Penny & Swazey, commission merchants, of Kansas City, due without grace June 14, 1900, secured by a mortgage on cattle, which was duly filed for record. The payees sold the note to the Watkins National Bank of Lawrence, which sent it for collection to the Inter-state National Bank at Kansas City a few days before its maturity. To meet this note the makers, on June 5, 1900, executed a new note, and a mortgage on the same cattle securing it, and sent it to Ladd, Penny & Swazey with directions to sell it and use the proceeds to pay the first note. Ladd, Penny & Swazey indorsed the note to the Union Brokerage Company to find a buyer for it. The Union Brokerage Company sold the note to the Boatmen's Bank of St. Louis, which paid for it by giving the brokerage company credit for the amount. The Union Brokerage Company paid Ladd, Penny & Swazey for the note by giving them its check on the Merchants' Bank of Kansas City. Ladd, Penny & Swazey had at the time issued checks on the Merchants' Bank which exceeded the amount of their deposit by $11,393.92. To provide for the payment of these checks, upon receiving notice from the bank that they had been presented and would not be paid unless such provision were made they, on June 13, deposited the check given them by the Union Brokerage Company for the Ringo & Askew note, and the checks were paid by reason of this deposit. The deposit was made in the Inter-state National Bank to the credit of the Merchants' Bank, in

accordance with an existing arrangement between the banks and Ladd, Penny & Swazey.

In the afternoon of June 14 the collector of the Inter-state National Bank, as was his custom, took the note which had been sent to it for collection by the Watkins bank, carried it to the office of Ladd, Penny & Swazey, and left it there, going on with other business. Later in the afternoon he returned to the office and took from a basket, where it had been left for him, a check drawn by Ladd, Penny & Swazey on the Merchants' Bank, payable to the Inter-state bank, for the amount of the note. There was no conversation on the occasion of either visit. The collector took the check to the Inter-state bank, letting the note and mortgage remain with Ladd, Penny & Swazey.

Previous to this time (and the arrangement still subsisted) the Merchants' Bank had authorized the Inter-state bank to pay and charge to its account any checks drawn by Ladd, Penny & Swazey upon the Merchants' Bank that were stamped "Inter-state National Bank" under or across the words "Merchants' Bank." Where a check drawn by this firm upon the Merchants' Bank but not bearing the stamp "Inter-state National Bank" was presented at the latter bank, it was the custom to call up the Merchants' Bank by telephone, ask instructions, and be governed by the reply.

The check under consideration bore no such stamp. When it was delivered by the collector to the teller of the Inter-state bank a little after three o'clock he called up the Merchants' Bank and inquired if it was good. The officer of the Merchants' Bank who responded to the inquiry understood that another check was referred to—one for a smaller amount given by Ladd, Penny & Swazey to a different payee—and answered that it was good and that his bank would pay it. Relying upon this assurance the Inter-state bank cred-

Bank v. Ringo.

ited the Watkins bank with the amount of the check and mailed to it a postal card reading as follows:

"J. D. ROBERTSON, Prest.    LEE CLARK, V.-prest.    WM. C. HENRICI, Cash.
"THE INTER-STATE NATIONAL BANK,
Stock-yards Station, Kansas City, Kan.
JUNE 14, 1900.

"Yours of —— received with enclosures as stated. Due diligence will be observed in the selection of banks or agents for the collection of all papers out of the city, but this bank will not be responsible for the failure or negligence of such bankers or agents. All items credited subject to payment.

Credited:            Entered for collection:
No. 16,513.  $10,209.63.    W. N. Bank, June 15, 1900."

It also mailed the check to the Merchants' Bank for collection and credit. The Merchants' Bank, about two hours after the conversation related, discovered its mistake and attempted to reach the Inter-state bank by telephone, but was unable to do so. At half-past eight the next morning, however, it did so, explained the misunderstanding of the day before, said that Ladd, Penny & Swazey had no funds to meet the check, and asked in substance to be relieved of any liability resulting from its former statement. The Inter-state bank answered in effect that it had surrendered the note for which the check was given and which it had held for collection, and that it could not release the Merchants' Bank, but that it would do what it could to assist it and for that purpose would talk with the Watkins bank. It accordingly at once called up that bank by telephone, stated that the notice of credit of the day before had been sent by mistake, that a check which had been given for the note had not been paid, and asked instructions. Later in the day the Watkins bank directed the protest of the note, without having been informed, however, of the details of the transactions of the previous day or of the connection of the Merchants' Bank with the matter.

The Merchants' Bank, on the morning of the 15th, refused payment of the check and returned it to the

Inter-state bank, which on the same morning, between nine and ten o'clock, sent it to Ladd, Penny & Swazey and exchanged it for the Ringo & Askew note and mortgage. The note was then formally protested. The Merchants' Bank, during all of this time, carried a deposit of some $25,000 with the Inter-state bank. At some time—the exact date does not seem to be shown and is not important—the Inter-state bank charged the amount of the check against this deposit. On June 16 the Watkins bank, having learned all the circumstances of the case, notified the Inter-state bank that it refused to permit the credit given it to be set aside, and would insist upon the payment of the amount. On June 18 the Inter-state bank replied stating that while it had originally credited the Watkins bank with the amount, and charged it to the Merchants' Bank, it had now charged it to the Watkins bank and placed it in the form of a cashier's check, and was so holding it pending a settlement of the matter. About a month later the Inter-state bank paid the money to the Merchants' Bank, upon the execution of a bond indemnifying it against the claim of the Watkins bank.

After three o'clock in the afternoon of June 14 Ladd, Penny & Swazey took notes of the face value of $28,000 to the Merchants' Bank and asked it to accept them as collateral security for all overdrafts, notes and bills of exchange, and to agree to pay all their checks that had been written that day. This the bank refused to do, the officers conducting the negotiations saying that they would have to take the matter up with the other directors. The collateral offered was left with the bank and was never returned to Ladd, Penny & Swazey.

On the morning of June 15 the Union Brokerage Company saw the note and mortgage in the office of Ladd, Penny & Swazey, in their custody and under their control.

Ringo & Askew brought a suit against all persons interested asking that their first note be canceled, upon the theory that it had been paid. Issues were framed

between the various parties, findings were made embodying substantially the facts already stated, from which the court concluded that the note had been paid, and a judgment was rendered decreeing the cancelation of the note, ordering the Inter-state bank to pay its amount to the Watkins bank, declaring that the note held by the Boatmen's Bank was a first lien upon the mortgaged cattle, and holding that the question of the liability of the Merchants' Bank to the Inter-state bank was not raised by the pleadings. The Inter-state bank prosecutes error.

*C. F. & S. D. Hutchings, McFadden & Morris,* and *William R. Smith,* for plaintiff in error.

*S. D. Bishop, A. C. Mitchell, I. N. Watson,* and *Edwin C. Meservey,* for defendants in error.

The opinion of the court was delivered by

MASON, J.: In support of the judgment rendered it is argued that, inasmuch as the check given by the Union Brokerage Company to Ladd, Penny & Swazey really belonged to Ringo & Askew, it could not under the circumstances of this case be diverted from its true ownership, but after its deposit in the Merchants' Bank constituted a trust fund for the purpose for which it was intended, namely, the payment of the first Ringo & Askew note. The cases of *Cady v. South Omaha Nat. Bank,* 46 Neb. 756, 65 N. W. 906, 49 Neb. 125, 68 N. W. 358, and *Davis v. Panhandle Nat. Bank et al.,* 29 S. W. (Tex. Civ. App.) 926, are the strongest ones cited to sustain this contention. Whether the doctrine they announce would apply to the facts here presented need not be determined, for this court has already refused to follow them. (*Kimmel v. Bean,* 68 Kan. 598, 75 Pac. 1118, 64 L. R. A. 785, 104 Am. St. Rep. 415.) Upon the authority of that case and *Martin v. Bank,* 66 Kan. 655, 72 Pac. 218, it must be held that the proceeds of this check became the absolute property of the Merchants' Bank, and the situation

presented is no different from what it would have been if Ladd, Penny & Swazey had spent the money which belonged to Ringo & Askew for any other purpose of their own, instead of using it, as they happened to do, to provide for the payment of checks issued by them upon the Merchants' Bank. As was said in the syllabus of *Martin v. Bank,* 66 Kan. 655:

"A bank cannot be held to account to the owner of a fund where such fund has been deposited by an agent in his own name and paid out upon his check without knowledge by the bank of any want of power on the part of the agent."

The two principal questions involved are: (1) Do the circumstances narrated show a payment of the Ringo & Askew note so as to discharge the makers from liability upon it? (2) Was the conduct of the Inter-state National Bank such as to establish a liability against it in favor of the Watkins National Bank?

The inquiry whether the note was paid may perhaps be simplified by a consideration of the effect of the successive steps in the transaction. The mere delivery and acceptance of the check of course did not constitute a payment and were no evidence of a payment. (22 A. & E. Encycl. of L. 569, ¶ 13.) The surrender of the note (if it is to be considered as having been surrendered) did not affect the matter one way or the other. (22 A. & E. Encycl. of L. 572, *d.*) If the Inter-state bank had been the owner of the note, and upon receiving the check had made entries upon its books as though a payment had been made, this likewise would have been immaterial, for such entries would be interpreted in the event of the non-payment of the check as evidencing conditional payment only. (*Stone and Gravel Co. v. Gates Iron Works,* 124 Ill. 623, 16 N. E. 923; *Turner v. The Bank of Fox Lake,* 3 Keyes [N. Y.] 425.) Credits made upon books of account can have no greater effect in this connection than receipts given acknowledging payment, and these, where exchanged

for checks, do not show that absolute payment was intended. (22 A. & E. Encycl. of L. 572, e.) The fact that the Inter-state bank held the note for collection and credited the proceeds to the Watkins bank does not call for a different rule in interpreting the entry of such credit. Whatever effect it may have had upon the relations of the Inter-state bank and the Watkins bank, it was as to the makers of the note merely evidence of a conditional payment.

If, then,,the note was ever paid so as to protect Ringo & Askew, this condition must have resulted from the transactions between the Inter-state bank and the Merchants' Bank. In this connection it is important to notice that in the telephone conversation between these banks on June 14 the Merchants' Bank did not authorize the Inter-state bank to pay the check out of the funds of the Merchants' Bank then on deposit in the Inter-state bank. If that authority had been given and acted upon the situation would have been the same as though the check had been presented at the counter of the Merchants' Bank and there accepted for the credit of the holder. In such a case, according to the prevailing doctrine, the check would ordinarily have been deemed paid, whatever might have been the condition of the account of the drawer, upon the principle that in such circumstances the bank is bound to know of the state of its depositor's account and cannot be relieved from the effect of any mistake it may make in that regard, and that the entry of the credit closes the transaction. (2 Morse, Banks & Bank., 4th ed., § 569; 2 Dan. Neg. Inst., 5th ed., §§ 1621, 1622; 5 A. & E. Encycl. of L. 1058.) And if the check had been paid, of course this would have operated to change the conditional payment of the note into an absolute payment. But what the Merchants' Bank in fact did was merely to say that the check was good and to promise to pay it. This was no more than an oral acceptance or certification of the check, and was not binding by

reason of section 547 of the General Statutes of 1901, which reads:

"No person within this state shall be charged as an acceptor of a bill of exchange, unless his acceptance shall be in writing, signed by himself or his lawful agent."

A bank check is held to be a bill of exchange within the meaning of this section. (*Eakin v. Bank,* 67 Kan. 338, 72 Pac. 874.) It does not appear that the Inter-state bank charged the check to the account of the Merchants' Bank on the 14th—the day it was given— for on that day it was mailed to the latter bank for collection and credit. Such an entry upon the books of the Inter-state bank, however, would have been unimportant, for it would have been made without authority. The matter is not affected by the consideration that the Inter-state bank afterward attempted to hold the Merchants' Bank liable for the payment of the check, and accordingly made an entry upon its books showing a deduction of the amount from the deposit account of the Merchants' Bank. The assertion by the Inter-state bank of a claim against the Merchants' Bank which could not be maintained did not operate by estoppel or otherwise to prevent its standing upon any legal right it might have against Ringo & Askew. It follows that the trial court erred in concluding that the facts found showed that the Ringo & Askew note had actually been paid. As the note until paid was secured by a lien upon the cattle, it was likewise error to hold that the mortgage accompanying the note held by the Boatmen's Bank was a first lien.

To sustain the trial court in holding the Inter-state bank liable to the Watkins bank the defendants in error invoke the doctrine that a collecting agent who surrenders the note of his principal in exchange for the check of the maker thereby assumes the risk of its payment. The plaintiff in error denies the doctrine, and contends that the collecting agent is protected from liability in pursuing such course by the fact that

it is in accordance with a custom of bankers and busi-
ness men of which the courts must take notice.    Of
this contention it is said in Daniel on Negotiable In-
struments (vol. 2, 5th ed., § 1625) :

"While it may be, and as a general rule undoubtedly
is, the practice of creditors, in mercantile communities,
to take checks in the collection of debts, and frequently
to surrender other instruments on receiving them, such
a practice, on the part of the principal, falls far short
of a usage which would permit the agent to do like-
wise."    (See, also, 5 Cyc. 505, 506; 3 A. & E. Encycl.
of L. 804.)

Assuming, but not deciding, that ordinarily where a
bank holding a note for collection in surrendering it
to the maker in exchange for his check upon another
bank thereby makes itself liable to the owner of the
note for the amount, would not this case be taken out
of the rule by the fact that the Inter-state bank re-
gained possession of the note under the circumstances
already stated?    In Daniel on Negotiable Instruments
(vol. 2, 5th ed., § 1625) it is said:

"In the United States it is quite certain that a
banker or other agent, holding a bill or note for collec-
tion, would act at his peril in delivering it up on re-
ceipt of a check for the amount; and that if the debtor
did not pay the amount in money, and the drawer or
indorsers were not duly notified, they would be dis-
charged, and the loss would fall upon the collecting
agent.    If, indeed, on the same day that the bill or
note was due the agent received a check for the amount
and delivered up the bill or note, but on presentment
of the check at the bank, and refusal of payment that
very day, it had been returned, the bill or note re-
claimed and protested, and the drawer or indorsers
duly notified, then no right would be forfeited, but
the liability of all preserved.    But if the agent neg-
lected to present the check until the next day, it would
then be too late to preserve recourse against the
drawer, if a foreign bill, by making protest; and if in
the meantime the bank had failed, the loss would fall
upon the agent."

This language makes plain the theory upon which

the rule referred to is based, which is that the collecting agent who assumes without authority to pursue a course that results in releasing a part of the security of the note, thus rendering it less valuable than it was before, is justly held to become at once liable to the owner for the full amount, perhaps irrespective of any question of actual or probable final loss. There is at least plausible ground for the argument that until the note is paid its owner is entitled to its possession and to all the incidental rights attached to it, and, therefore, an agent who fails to return either the very thing entrusted to him, or its equivalent in money, the only thing he is authorized to accept for it, should not be permitted to haggle about the extent of the resulting injury but should be compelled to respond at once to his principal for the full amount of the note and to look for his own reimbursement to whatever rights he has succeeded in retaining against the maker. But when the note is recovered without its vitality or security having been in any way impaired, no reason is apparent why the agent should be liable at all, unless to the extent of any actual loss that might have been occasioned by his act. Therefore, as suggested by Mr. Daniel, a recovery of the note by the collecting agent upon the very day of its surrender to the maker retrieves any wrong thereby done to the owner. But manifestly the only importance of the two acts being done on the same calendar day arises from the necessity under ordinary circumstances of the note being protested on the day of presentation in order to hold the indorsers.

In the present case there was no indorsement upon the note except that of Ladd, Penny & Swazey, who were hardly in a position to assert a right to notice of its dishonor. Moreover, the note bore upon its face a waiver by the makers and indorsers of both protest and notice of non-payment. Therefore, the fact that the Inter-state bank did not recall the note from Ladd, Penny & Swazey on the very day upon which it was de-

Bank v. Ringo.

livered to them is not controlling here. The leaving of the note at the office of Ladd, Penny & Swazey by the collector was clearly only provisional, as well after he had obtained the check as before. The Inter-state bank could not upon any theory be considered as having surrendered the note until it had made inquiry of the Merchants' Bank about the check. This was after banking hours on June 14. The knowledge that the check was worthless was imparted to it before the beginning of banking hours on the next day, and it at once acted upon the information. So far as the mere lapse of time was concerned the interval was no more significant than if these acts had all been done upon the same day, and no just cause appears for giving them any different effect than would have resulted had the Merchants' Bank succeeded in reaching the Inter-state bank by telephone at the time it attempted to do so on June 14 for the purpose of correcting the mistake which it then suspected had occurred.

We do not understand that it is claimed, and it certainly cannot successfully be maintained, that the mere physical exchange of a note held for collection for a check can at once fix a liability upon the collecting agent, irrespective of all considerations of the subsequent conduct of the parties. If after such an exchange the agent, before the maker of the note left his presence, should become so far doubtful of the sufficiency of the check as to insist upon and obtain a retransfer of the note, this would clearly reinstate the precise situation that existed before any surrender of the note was made. In the present case if, when the Inter-state bank first called up the Merchants' Bank, it had been told that the check was worthless and had then reclaimed the note, probably no contention would have been made that it had incurred any liability. This is for all practical purposes just what was done, so far as the mere matter of time was concerned—for the delay was really insignificant. We are, therefore, of the opinion that the recaption of the note was ac-

complished under such circumstances as to relieve the Inter-state bank of liability, unless the matter is affected by its entry upon its books of a credit to the Watkins bank, and by its subsequent dealings with that bank and the Merchants' Bank.

We cannot regard this entry of credit upon the books of the Inter-state bank as any more determinative of its relations with the Watkins bank than of the question of the payment of the note. In *Bank v. Brightwell,* 148 Mo. 358, 49 S. W. 994, 71 Am. St. Rep. 608, it was said:

"When a note or draft is sent by one individual or bank to another bank for collection and to remit the proceeds to the sender, the relation of principal and agent is created, and not that of creditor and debtor. . . . Having received the note or draft for collection it does not owe the amount thereof to the sender until collected, and though it may credit in its books therefor such a credit may be treated as provisional if the paper is afterward dishonored, and it may cancel the credit."

"The fact that the depositor's account is credited with the amount of the items taken for collection does not of itself operate to transfer the title to the paper; for, by the custom of bankers, the collection is charged back at once if not paid." (3 A. & E. Encycl. of L. 817.)

The fact that the credit was given only after the check had been received and an inquiry made about it does not affect the principle by which the matter is controlled. The bank might well elect to give credit only for such collection items as upon investigation it believed reasonably certain would be paid, and to hold others without credit until actual payment, without, by pursuing such course, binding itself to be answerable whenever its judgment that payment would be made should prove mistaken.

The rule, already referred to, that when a bank accepts a check and credits a depositor with it the transaction is deemed closed and cannot be reopened for the

Bank v. Ringo.

correction of a mistake is confined to checks drawn upon the bank which gives the credit, and proceeds upon the principle before stated that the bank is conclusively presumed to know the state of its depositor's accounts. Even with this limitation the rule has not always been approved. (1 Morse, Banks & Bank., § 419; 3 A. & E. Encycl. of L. 817, second paragraph of note 1.)

In *Steinhart v. National Bank,* 94 Cal. 362, 29 Pac. 717, 28 Am. St. Rep. 132, it was held, although without full discussion, that a bank to which a note had been sent for collection and which at the request of the maker, its customer, charged the amount to him, marked the note canceled, and deposited in the mail addressed to the owner of the note a draft for the amount, might still upon discovering that the maker was insolvent reclaim the draft, rescind the entry upon its books, return the note to its principal, and by these means escape liability on its own part, such transactions not having effected a payment of the note. (See, also, *Bank v. Cummings,* 89 Tenn. 609, 18 S. W. 115, 24 Am. St. Rep. 618; *Second Natl. Bank of Balto. v. Western Natl. Bank of Balto.,* 51 Md. 128, 34 Am. Rep. 300.)

The postal card sent to the Watkins bank is not more effective than the credit upon the books of the Inter-state bank. Indeed it is somewhat significant of the character of the entire transaction that while this card acknowledged the receipt of the note, and the entry of credit for the amount, it also gave express notice that all items were credited subject to payment.

The attitude of the Inter-state bank toward the Merchants' Bank—the attempt to insist upon the payment of the check—cannot avail the Watkins bank, which was not entitled to rely upon it and was not misled by it. The positions that the Inter-state bank assumed in its communications with the other two banks may not have been entirely consistent with each other,

9—72 KAN.

but it was not required to determine at its peril what its obligation might be under the law and at once act accordingly. It was probably in doubt whether it might not be able to hold the Merchants' Bank accountable upon its oral acceptance of the check, and as it had funds of that bank in its custody it prudently decided to retain enough to cover the amount until its rights should be settled or until it was otherwise indemnified.

The Watkins bank suffered no prejudice through the failure of the Inter-state bank to learn on the 14th that the note would not be paid. The notice that it had been given credit was mailed to it after half-past three o'clock in the afternoon of that day. Even if this had justified an inference of the payment of the note it would have been counteracted by the telephone message given before nine o'clock the next morning. In any view of the case this was a timely notice of nonpayment, and gave the Watkins bank every opportunity to which it was entitled to protect its interests.

We are unable to attach any significance to the circumstance that the Union Brokerage Company saw the Ringo & Askew note uncanceled in the possession of Ladd, Penny & Swazey on the morning of June 15. Nor can we believe that the case is affected in any aspect by the fact that Ladd, Penny & Swazey deposited certain collateral with the Merchants' Bank to secure any claims against them, for it is expressly shown that the bank did not agree with them to pay the check in question. The case is a hard one for Ringo & Askew, but their misfortune results from the misappropriation of their funds by agents of their own selection. If the transactions between Ladd, Penny & Swazey and the several banks had resulted in destroying the vitality of the first note, the purely fortuitous circumstance of a mistake occurring in a telephone conversation to which they were not a party would have enabled Ringo & Askew to shift their loss to one of the banks. If any principle of law enabled them to do this they

would of course be entitled to the full benefit of their good fortune. In the absence of any such legal doctrine there is no peculiar hardship in permitting the loss to remain where it originally lodged, nor is any rule of equity or good conscience thereby violated.

The judgment is reversed and the cause remanded, with directions to render judgment upon the findings in accordance with the views herein expressed.

All the Justices concurring.

PORTER, J., not sitting.