No. 18,458.

WILLIAM N. BALLARD, *Appellee,* v. THE HOME NATIONAL BANK OF ARKANSAS CITY, *Appellant.*

No. 18,459.

BERT WOOD, *Appellee,* v. THE HOME NATIONAL BANK OF ARKANSAS CITY, *Appellant.*

SYLLABUS BY THE COURT.

BANK—*Agreement with Customer to Honor Check—Agreement Performed by Customer—Bank Liable to Holder of Check.* Where a national bank through its president agrees with a customer, who is indebted to it, that if he purchases live stock and in payment therefor gives checks on the bank, the checks will be paid provided that by the time they are presented the drawer shall have resold the stock and deposited the proceeds with the bank, and in pursuance of such agreement the customer issues checks in payment for stock which he at once resells, delivering the proceeds to the bank, the holder of such checks can maintain an action for their amount against the bank, notwithstanding he did not know of the agreement, and notwithstanding nothing was said at the time the deposit was made about the agreement or the application of the funds.

Appeals from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed December 6, 1913. Affirmed.

*J. Mark Love, C. W. Wright,* both of Arkansas City, *W. P. Hackney,* and *J. T. Lafferty,* both of Winfield, for the appellant.

*A. M. Jackson,* and *A. L. Noble,* both of Winfield, for appellee Ballard.

*G. H. Buckman, S. C. Bloss,* both of Winfield, and *W. S. Cline,* of Newkirk, Okla., for appellee Wood.

The opinion of the court was delivered by

MASON, J.: Jasper Stewart was engaged in buying and selling live stock. His custom was to purchase horses and mules, giving in payment his checks on The Home National Bank, of Arkansas City. Later he would borrow money from the bank upon his personal note to meet the checks. This plan became unsatisfactory to the bank, by reason of unsuccessful transactions made by Stewart, and it notified him that it would no longer loan him money, and that he must make some other arrangement if he desired to continue business relations with it. Subsequently a conversation was had between the president of the bank and Stewart, which it is contended resulted in an agreement that Stewart might continue to buy stock, giving checks therefor, which would be paid by the bank, provided money for the purpose was furnished by Stewart from the sale of the stock he had purchased. Stewart bought stock from several persons, giving his checks. He made sales sufficient for the purpose and deposited the proceeds in time to meet the outstanding checks. The bank, however, refused to pay them, and applied the deposit to the preëxisting debt of Stewart. Two separate actions were brought against the bank by holders of the checks. In each the plaintiff recovered, and the defendant appeals.

Stewart and the bank president, A. H. Denton, gave substantially the same account of their conversation. One who overheard it testified to some additional particulars. Denton's version was this:

"I told him that as I had informed him before, we would buy no more mules for Mr. Stewart, at least not until after the feed business and the unfinished business was settled. He said: 'Perhaps I can beat them around.' That was practically the end of the conversation. To which I made answer, 'That might do.' "

—

. Stewart testified that he spoke with Denton about buying some mules, and proceeded:

"Mr. Denton, he says, 'No, we will buy no more mules at present, until we get this feed deal off.' . . . I says, 'Suppose I buy and check for some mules and beat the checks in?' He says, 'That might do.' "

The third person testified:

"Mr. Stewart told Mr. Denton that he had a bunch of mules down there that he was going to buy, and Mr. Denton spoke up and told him that he would n't pay any of his checks. He says, 'Well, I have these mules sold,' and he mentioned the man's name, I don't remember it; and Mr. Denton says, 'Well, that is all right, his checks are good.' He asked Mr. Stewart when he was coming in and Mr. Stewart told him the day, but I don't remember the date; it was along the last of the week some time. He says, 'If you are coming in then you will beat those checks in, because you know how they do, some of them run around several days before they get in the bank.' That is about all the conversation I heard talked."

We think this evidence sufficient to sustain a finding that the bank, by its president, agreed with Stewart that he might draw checks upon it in payment of stock, and that, notwithstanding his past due debt to the bank, it would pay the checks, provided he "beat them in"— that is, provided he resold the stock and turned the proceeds over to the bank in time to furnish a fund for their payment. It was a fair question of fact whether under all the circumstances this was what each party intended. The jury by its general verdict, under proper instructions, must be regarded as having rendered an affirmative answer, thus settling this issue.

The jury were instructed, in substance, that in order to render a verdict for the plaintiff they must find that in pursuance of the agreement Stewart bought the stock, giving his checks therefor, and deposited the proceeds with the bank. These facts also must therefore be regarded as established. We think these findings, considered in connection with the undisputed

facts, compel the conclusion that, as against Stewart at least, the bank could not rightfully refuse the payment of the checks. "All the authorities are agreed upon the rule of law declared in the above case, that a bank which accepts a deposit of money made by a depositor for a special purpose, under an agreement that it will pay the amount when needed for that purpose, can not rightfully appropriate such deposit to discharge the depositor's indebtedness to it." (Note, 30 L. R. A., n. s., 517; see, also, Notes, 111 Am. St. Rep. 425; 2 Ann. Cas. 206; 19 Ann. Cas. 488.) It is not necessary, in order for this rule to apply, that there shall be what is strictly and technically known as a "special deposit." It is enough that there is an agreement for a particular application of the fund. The bank's right to a lien upon deposits is not of such character that it may not be waived. As was said in the case to which the note quoted from is attached:

"Of the general rule that a bank to whom a depositor is owing a matured indebtedness may appropriate the general deposit of its debtor to the discharge of the obligation, there can be no doubt. . . . But it is no less certain that a deposit made for a special purpose, *or under a special agreement,* can not rightfully be so appropriated. . . . Indeed, the proposition that a bank enjoys no exemption from the general rule by which every party to a business transaction or agreement is legally bound to respect the obligation of his contract is one which ought to require neither argument nor citation of authority." (*Smith v. Sanborn State Bank,* 147 Iowa, 640, 644, 645, 126 N. W. 779, 30 L. R. A., n. s., 517.)

The defendant maintains that the evidence did not warrant the application of this principle, or if so, that proper instructions were not given concerning it. It is urged that the bank had no notice that the deposits made by Stewart were for the protection of the checks in question. They were turned into the bank without specific directions given at the time. They were, however, in the form of checks bearing upon their faces

memoranda showing that they were given "for mules," which served to connect them with the transaction discussed by Stewart and Denton. But it would refine too closely to suppose that the bank did not understand the purpose of the deposit. At the time of depositing one check Stewart said to the bank president, "You might send Bert Wood [one of the plaintiffs] a draft for $620." The president said, "Why don't you send him your own check?" Stewart did so, the check being one of those sued on. The president was asked with respect to other checks deposited by Stewart: "You knew they were for the purchase of mules?" He answered, "Well, I could have inferred so, yes sir." The agreement had been made that if Stewart beat his checks in they were to be paid. His contract required him to get the money to the bank in time to meet the checks, and he did so. He was not required to make what could with strict accuracy be called a "special deposit." The direction for the application of the fund resulted from the previous agreement, and from the fact that the deposit was made in pursuance thereof. Complaint is made in this connection of an instruction that the plaintiff might recover "even though Stewart deposited the proceeds of the sale of the mules in the bank and took credit for the same generally on his account and without any direction to the bank as to how such deposit should be applied." The jury had already been told that the plaintiff had the burden of proving that the deposit was made in pursuance of the prior agreement. In view of this we think the fair interpretation of the language quoted is that it was not essential to the plaintiff's recovery that any specific direction should have been given at the time of the deposit.

The defendant further maintains that whatever may be the relations between the bank and Stewart, the plaintiffs have no cause of action against the bank, because there is no privity between them. Of course, by the usual rule, which obtains in this state, the

holder of a check can not ordinarily maintain action thereon against the bank, notwithstanding it may have had funds to meet it when it was presented. (Note, 5 Ann. Cas. 189; Note, 80 Am. St. Rep. 870; Note, Ann. Cas. 1913 D, 418.) Special circumstances, however, may give to the issuance of a check the character of a *pro tanto* assignment, thereby vesting in the holder a right of action upon it against the bank on which it is drawn. (*Fourth Street Bank v. Yardley,* 165 U. S. 634.) Here the actions are not brought upon the checks alone, but upon the entire transaction, of which the giving of the checks forms a part. If the plaintiffs had been present at the conversation between Stewart and Denton it can not be doubted that they would have a right of action against the bank. The contract made at that time was obviously for their benefit, and they are entitled to rely upon it, notwithstanding they had no prior knowledge concerning it. (*Griffith v. Stucker,* ante, p. 47.)

(See, also, *Anthony v. Herman,* 14 Kan. 494; *Harrison v. Simpson,* 17 Kan. 508; *K. P. Rly. Co. v. Hopkins,* 18 Kan. 494; *Bank v. Crowell,* 6 Kan. App. 533, 51 Pac. 575; *Bank of Garnett v. Cramer,* 7 Kan. App. 461, 53 Pac. 534; *Gruenther v. Bank of Monroe,* 90 Neb. 280, 133 N. W. 402—decided since the adoption of the uniform negotiable instruments act.)

The bank had on hand funds which it not only was at liberty to apply to the checks presented by the plaintiffs, but which it had undertaken to use for that purpose—which by virtue of its agreement with Stewart had been so appropriated. The money obtained by the sale of the property of the plaintiffs was received by the bank under a virtual promise to hold it for their benefit, and pay them out of it.

The negotiable instruments act provides specifically that a bank is not liable to the holder of an unaccepted check (Gen. Stat. 1909, § 5442), and that the acceptance must be in writing (Gen. Stat. 1909, § 5385;

Ballard v. Bank.

*Rambo v. Bank,* 88 Kan. 257, 128 Pac. 182), and if on a separate paper, operates only in favor of one to whom it is shown (Gen. Stat. 1909, § 5387). These provisions are declaratory of the law as it already existed. (Gen. Stat. 1901, §§ 547, 548; *Eakin v. Bank,* 67 Kan. 338, 72 Pac. 874; *Clark v. Bank,* 72 Kan. 1, 82 Pac. 582; *Bank v. Ringo,* 72 Kan. 116, 83 Pac. 119.) The present actions are not brought simply on the promise of the bank to pay Stewart's checks issued in payment for stock. They are brought upon that promise, supplemented by the carrying out of the conditions on which it was based—the purchase of the stock, the issuance of the checks, the resale of the stock and the deposit of the proceeds to meet the checks—in effect the receiving by the bank of the money appropriated by agreement to that purpose.

It is suggested that the making of such an agreement was beyond the power of the president of a national bank, or of the bank itself. The contract was not immoral or forbidden, and even if when made it was invalid for want of capacity on the part of the officer or of the bank, it was so far carried out that a defense on that ground can not successfully be interposed. (See cases cited in *Harris v. Gas Co.,* 76 Kan. 750, 92 Pac. 1123.)

The judgments are affirmed.