PEOPLE'S NATIONAL BANK *v*. L. M. SWIFT.

(*Nashville.* December Term, 1915.)

**1. APPEAL AND ERROR. Review. Trial by court.**

Where a cause is tried by the judge without a jury, the judgment
must be affirmed on appeal if there is any evidence on which
it can be sustained. (*Post, pp.* 177-181.)

Case cited and approved: Hinton v. Insurance Co., 110 Tenn.,
113.

**2. APPEAL AND ERROR. Review. Trial by court.**

On trial by a court without a jury, the appellate court will take
that view of the evidence most favorable to the prevailing
party. (*Post, pp.* 177-181.)

**3. BANKS AND BANKING. Payment of checks. Liability of
bank.**

Where the drawer and payee of a check agreed that the check
should be paid from the proceeds of drafts drawn on third
parties through the defendant bank, on whom the check was
drawn, and the bank on being informed of the arrangement
told them to send the check in, and that as soon as the draft
would come the check would be paid, the bank was estopped
to deny that enough of the proceeds of the draft had been
appropriated to pay the check. (*Post, pp.* 181-183.)

Case cited and distinguished: Bank v. Yardley, 165 U. S., 634.

**4. ASSIGNMENTS. Payment of checks. Liability of bank.**

Negotiable Instruments Law (Laws 1899, ch. 94) sec. 189, under
which a check does not operate as an assignment of any part
of the fund to the credit of the drawer, so that the bank is not
liable to the holder until it accepts or certifies the check, does
not prevent an appropriation of a fund in the bank by the
parties to a check to meet its payment when such appropriation

is brought to the attention of the bank before it has paid out the money. (*Post, p.* 181.)

5. **BANKS AND BANKING.** "Acceptance" of check. Retention by bank.

A bank was informed on December 31, 1912, that a check had been drawn upon it, and that the parties thereto had agreed that it was to be paid out of the proceeds of a certain draft which had been drawn on a third party through the bank, and the bank agreed to the arrangement, and the check was sent to it immediately, and on February 11, 1913, the bank reported that the drafts had not been honored, but that they would be and that as soon as it got the money it would settle, and on February 24th the payee wrote to the bank to still hold the check, but in fact the drafts had been collected by the bank on February 8th and placed to the credit of the drawer and exhausted by February 15th in making payments in which the bank was to an extent interested. *Held,* that there was an "acceptance" of the check by the bank within the meaning of Negotiable Instruments Law, sec. 137, providing that where the drawee after acceptance destroys the bill or refuses within twenty-four hours after delivery or within such other period as the holder may allow to return the bill, he will be deemed to have accepted the same. (*Post, pp.* 183-187.)

Case cited and approved: Wisner v. First Nat. Bank, 220 Pa., 21.

Case cited and distinguished: Westberg v. Chicago Lumber & Coal Co., 117 Wis., 589.

FROM SUMNER.

Appeal from the Circuit Court of Sumner County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—W. L. Cook, Judge.

ED. T. SEAY and W. W. PARDUE, for plaintiff in error.

TRUE & DORSEY, for defendant in error.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This action was brought originally before a justice of the peace of Sumner county, by the defendant in error, and from a judgment against him he prosecuted an appeal to the circuit court of the county, and in that court a judgment was rendered in his favor. The bank then prayed an appeal to the court of civil appeals, and there the judgment of the circuit court was affirmed. The case was then brought to this court by the writ of *certiorari*. The action was upon a check of $420, drawn on the plaintiff in error by one C. A. Nolen, on December 31, 1912, in favor of the defendant in error, Swift. It was indorsed by the latter to the Bank of Whitehouse for deposit. That bank indorsed it to the plaintiff in error (located at Gallatin, Tenn.) for collection. The latter failing to collect, the check was taken up from the Bank of Whitehouse by Swift, and suit brought by him against the plaintiff in error, as stated.

The case was tried in the circuit court by the judge without the intervention of a jury. Under such circumstances the rule is that if there is any evidence upon which the judgment can be sustained, it must be affirmed on appeal. *Hinton* v. *Insurance Co.*, 110

Tenn., 113, 72 S. W. 118. We must therefore take that view of the evidence which is most favorable to the plaintiff below, defendant in error here.

Taking this view, there is testimony in the record to sustain the following facts:

Nolen had purchased some mules from Swift, and, to pay for them, gave him the check above mentioned, informing him at the time that he was going to draw a draft or drafts on Atlanta through the plaintiff in error bank, and that the check would be paid out of this fund when the draft should be collected. Nolen then went to Gallatin, and Swift went to the Bank of Whitehouse, in Robertson county. Arriving there he had the cashier of the latter bank to call up Mr. Hitchcock, cashier of the plaintiff in error bank, and, according to the testimony of Mr. Corder, the first-mentioned cashier, and Swift himself, who says he stood near the telephone, Mr. Corder called Hitchcock's attention to the check, but it does not appear that he informed the latter of the agreement made between Nolen and Swift that the check should be paid out of the Atlanta draft. However, Hitchcock replied that Nolen said he had sent on to Atlanta, to the Atlanta Mule Company, that morning, two drafts. Hitchcock further said:

"When the draft would be paid it would be all right. Mr. Hitchcock said he sent the draft in, and to send the check in, and as soon as the draft would come it would be paid. . . . Mr. Hitchcock said, send it in, and when the drafts were paid, he would send me the money."

This conversation occurred December 31, 1912, and pursuant thereto the check was at once sent to the plaintiff in error bank, duly indorsed for collection. No further communication was had between the two banks until February 11, 1913. On that day, at the re-request of Swift, Mr. Corder called up Mr. Hitchcock, and inquired about the state of affairs. ''Hitchcock said the drafts had never been honored, but he thought they would be, and to rest easy, as soon as he got the money he would settle for it'' (the check), ''so I did rest easy thinking he would.'' Still supposing the drafts had not been collected, he wrote to Mr. Hitchcock on February 24th to still hold the check. However, the drafts, aggregating $870, had been collected by the plaintiff in error bank on February 8th and placed to the credit of Nolen, and on February 15th this fund had been totally exhausted in the following manner: Nolen gave a check to J. M. Hall & Co., of which Mr. Allen, the president of plaintiff in error bank was a partner, for $229.69, a check to plaintiff in error bank for $525 to cover a note he owed it, $32 was applied by the bank for insurance on certain mules which Nolen had shipped, the sale of which produced part of the fund covered by the draft, and the balance left of the $870 was applied on an overdraft which Nolen owed the plaintiff in error bank at the time he deposited with it the drafts for collection. On February 28th, Mr. Corder, being still in ignorance of these latter transactions, again called up Mr. Hitchcock, and made inquiry concerning the drafts. Mr.

Hitchcock then admitted that the Atlanta drafts had been collected, and said they had been applied to debts owing by Nolen to the plaintiff in error bank. He thereupon returned the check to the Bank of Whitehouse with the explanation that there were no funds to pay it. The evidence shows the following additional facts concerning the drafts on Atlanta.

In the interval between December 31, 1912, and February, 8, 1913, Nolen gave the plaintiff in error two drafts on Atlanta, aggregating $870. One of these was for $445, and the other $425. The $445 draft was to pay the estimated value of certain stock which Nolen was at the time shipping to Atlanta for sale, on which stock the plaintiff in error bank had a mortgage for a debt due to it. The $425 draft was for the estimated value of four mules that the firm of J.M. Hall & Co. of Gallatin had sold to Nolen, retaining title. When he was about to ship these mules to Atlanta, Hall & Co., one member of which firm was Mr. Allen, president of . plaintiff in error bank, demanded that Nolen give a draft on Atlanta for the amount stated as the probable value of these mules. At the time these drafts were put into the plaintiff in error bank, Nolen directed that bank not to pay out these funds, but to hold them until he should return from Atlanta, and then he would straighten up his affairs with the bank, and with Hall & Co., and pay out of the proceeds of the drafts what he owed the bank and Hall & Co. The drafts were collected and passed to the credit of Nolen on February 8, 1913. On Februrary 15, 1913, the proceeds of the two drafts were disposed of as already stated. Thus with the con-

sent of Nolen the whole fund was applied in the manner stated. When this money was received and paid out in this manner, the defendant in error's check was lying in the plaintiff in error's bank for collection. After this money was thus appropriated, to the debts of the plaintiff in error bank, and to the debt of J. M. Hall & Co., defendant in error's $420 check was returned to the Bank of Whitehouse, with the information that Nolen would call and see the latter bank the next day.

It is not directly proven, but may be inferred from the evidence, that Nolen was practically insolvent when he returned from Atlanta, having nothing visible except his deposit in the plaintiff in error bank. It is proven that J. M. Hall & Co. considered him "shaky," because of the disastrous market he had encountered in Atlanta. For this reason Hall telegraphed to Allen to intercept Nolen at Nashville, and get a check from him. Allen did so, and it seems he also at the same time procured the $525 check for the plaintiff in error bank. On March 12th, or 13th, Nolen left the country, and so far as this record shows, has not been heard of since.

The question is whether under the foregoing facts the plaintiff in error is indebted to defendant in error, Swift, on the $420 check just mentioned.

We are of the opinion that the plaintiff in error is so indebted on two grounds.

1. The arrangement between Nolen and Swift amounted to an appropriation of a sufficiency of the

Atlanta drafts to pay the check in question. It is true that it does not appear that this arrangement was communicated in terms to the plaintiff in error, but the latter agreed, as shown by the statement, that the check should be paid out of these drafts, and we must infer that Nolen had himself communicated to the plaintiff in error what had passed between him and Swift. At all events, since Nolen had agreed and the bank itself had consented to the same arrangement, in its talk with Mr. Corder, over the telephone, it would be estopped to deny the appropriation. It is true that under section 189 of the Negotiable Instruments Law a check of itself does not operate as an assignment of any part of the fund to the credit of the drawer, and the bank is not liable to the holder, unless and until it accepts or certifies the check. However, this section does not interfere with an appropriation of the fund by an outside arrangement between the parties which is brought to the attention of the bank before it has paid out the money. That there may be such an appropriation by an outside agreement is shown by the case of *Bank* v. *Yardley,* 165 U. S., 634, 17 Sup. Ct., 439, 41 L. Ed., 855. In this case it is said:

"Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if in the transaction connected with the delivery of the check it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a

specified fund, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice."

Under the circumstances of the present case it is not necessary that resort should be had to a court of equity.

2. We are of the opinion that the facts of the present case show an acceptance of the check within the sense and meaning of section 137 of the Negotiable Instruments Law, which reads:

"Where a drawee to whom a bill is delivered for acceptance, destroys the same, or refuses within twenty-four hours after such delivery, or within such other period as the holder may allow, to return the bill, accepted or non-accepted, to the holder, he will be deemed to have accepted the same."

Under section 185 a check is a bill of exchange, drawn on a bank, payable on demand. As shown in the statement the check in question was sent to the plaintiff in error bank for collection. It was to remain until the Atlanta drafts could be collected, and then was to be paid out of this source. On February 11th inquiry was made by the Bank of Whitehouse that had sent the check to the plaintiff in error as to the *status* of the matter. The reply was that the Atlanta drafts had not been collected, although the proceeds of these drafts had been in the plaintiff in error's possession since February 8th. After this the plaintiff in error, instead of paying the check out of the funds in hand, or at least returning it with a proper explanation as to its own

claim to an appropriation of the funds on its debt against Nolen, and for the debt of J. M. Hall & Co., retained it, for thirteen days thereafter, until on the 24th of February it received an order from the Bank, of Whitehouse to still retain it, the latter bank having been deceived by the false statement that the Atlanta drafts had not been paid. This retention under the circumstances was a conversion of the check; that is, the retention of the check during the 13 days mentioned; and this conversion could not be cured by the subsequent order to hold superinduced by the previous misstatement.

We think the correct general principles bearing on this subject are set forth in the following excerpt from *Westberg* v. *Chicago Lumber & Coal Co.,* 117 Wis., 589, 94 N. W., 572:

"Upon delivery for acceptance, the drawee is not bound to act at once. He has a right to a reasonable time—usually twenty-four hours—to ascertain the state of accounts between himself and the drawer, and until expiration of that time the holder has no right to demand an answer, nor, without categorical answer, to deem the bill either accepted or dishonored; not accepted, because of the right of drawee to consider before he binds himself; not dishonored, because both drawer and drawee have the right that their paper be not discredited during such period of investigation. After the expiration of that reasonable time the holder has a right to know whether the drawee assumes liability to him by accepting, and, if not, he has a right to

return of the document, so that he may protest or otherwise proceed to preserve his rights against the drawer. The consensus of authority is, however, that the duty rests on the holder to demand either acceptance or return of the bill, and that mere inaction on the part of the drawee has no effect. After the expiration of this time for investigation, the drawee may, by retention of the bill, accompanied by other circumstances, become bound as an acceptor; not, however, by mere retention. There seem to be two phases of conduct recognized by the authorities as charging the drawee: One purely contractual, as where the retention is accompanied by such custom, promise, or notification as to warrant the holder, to the knowledge of the drawee, in understanding that the retention declares acceptance; the other, where the conduct of the drawee is substantially tortious and amounts to a conversion of the bill. This is the phase of conduct which our Negotiable Instruments Statute . . . has undertaken to define and limit as refusal (not mere neglect) to return the bill, or destruction of it; reiterating the common-law rule that mere retention of the bill is not acceptance. . . . The doctrine of constructive acceptance is based on the general principles of estoppel. If the conduct of the drawee will prejudice the existing rights of the holder, unless it means acceptance, and the drawee has knowledge of such fact, he is estopped to deny the only purpose which could render his conduct innocuous, namely, acceptance of the bill. This underlying principle suggests the reasons for

many of the limitations upon the implication of acceptance from conduct; as, for example, that such implication arises only when the bill is presented for acceptance, and that no one but the holder (payee or indorsee) can make such technical presentment.  .  .  .
Only when the drawee knows that acceptance is expected would he suppose that his conduct can lead to a belief that he does accept.  Only when the presentment is by the holder, whose conduct and rights must be affected by acceptance or refusal, is the drawee charged by the strict rules of the law merchant with notice that his conduct may so injuriously affect the person delivering the bill to him.''

In section 497b of Daniels Negotiable Instruments (sixth edition), it is said, referring to sections 132 and 137 of Negotiable Instruments Law:

''The statute declares that acceptance of a bill must be in writing and signed by the drawee.  This section of the statute, abolishing verbal and implied acceptances by providing that the acceptance must be in writing and signed by the drawee, must be construed in connection with a further section'' (137) ''declaring that the action of the drawee in destroying a bill or in not returning it, as required by the section, shall be deemed an acceptance of it; and a constructive acceptance of a bill under the latter section is as effective to charge the drawee as an acceptance in writing under the former section''

—referring to *Wisner* v. *First National Bank,* 220 Pa.,

21, 68 Atl., 955, 17 L. R. A. (N. S.), 1266, which fully sustains the text.

We repeat that the retention of the bill under the circumstances stated amounted to its conversion, was a fraud upon its owner, and makes a case of acceptance under section 137.

It results that the judgement of the court of civil appeals will be affirmed.