Argued March 19; reversed April 9; rehearing denied
May 14, 1935

HOUCK ET AL. *v.* BANK OF NEWPORT ET AL.

(43 P. (2d) 179)

*Mark V. Weatherford,* of Albany (Weatherford & Wyatt, of Albany, on the brief), for appellants.

*George Black, Jr.,* of Portland, and *L. L. Krause,* of Toledo (Platt, Platt, Smith & Black, of Portland, on the brief), for respondents.

RAND, J. This is a suit to impress a trust upon $1,026.07 in moneys which Andrew J. Naterlin had on deposit in his checking account with the Bank of Newport on November 4, 1933, and was on said day applied by the bank in payment of past due obligations then owing by Naterlin to the bank. Prior to said application, Naterlin had issued individual checks to the plaintiffs to the amount thereof and, when these checks were duly presented to the bank for payment, payment was refused for lack of funds, caused wholly by the bank's application of the moneys.

Until July 25, 1933, Naterlin had acted as manager for the Newport Fish Company, a corporation doing business at Newport, Oregon, and had become personally indebted to the Bank of Newport as an indorser or otherwise on certain notes given by said company to the bank. At that time the Newport Fish Company and Naterlin were both insolvent. In order for Naterlin to engage in business for himself, he entered into a contract with the San Juan Fishing and Packing Company, a Washington concern, by which he agreed to purchase fish and process and ship the same to it for a stated commission and, in consideration thereof, that company agreed to advance him moneys from time to time to pay the costs of the fish and the expenses of processing and shipping the same, and it was agreed that all fish purchased by him should be shipped to it except a limited amount which he might buy with his own money and sell for local consumption.

Pursuant thereto and on said last-mentioned date, the San Juan Fishing and Packing Company caused an

order to be forwarded to the Bank of Newport directing it to credit Naterlin's account with the sum of $400, and, upon its receipt, the bank inquired of Naterlin how the same should be deposited and was instructed to deposit it in a special account to be designated as the Newport Fish Company Special Account. At that time Naterlin, according to his own testimony, informed the bank of the character of the deposit and of the terms of his agreement with the San Juan Fishing and Packing Company. Other advances were made and deposited in said special account until September 4, 1933, when, because of certain threatened litigation by others against the Newport Fish Company, Naterlin directed the bank to change the name of the account and to thereafter deposit all moneys received from the San Juan Fishing and Packing Company in his own individual name, and all such advances thereafter received were deposited to his credit individually. The last of the advances so made was for $1,000 and was deposited and credited to his account on November 2, 1933, and the moneys so credited were included in the amount appropriated by the bank in payment of its own claims on November 4, 1933.

Between July 25, 1933, and November 2, 1933, when the last advance was received, the San Juan Fishing and Packing Company, had, pursuant to its said agreement, advanced to Naterlin more than $15,000, all of which sums were deposited in the bank, the last item being, as stated, a check for $1,000 which that company had issued payable to the order of Naterlin.

█ The bank contends that at the time it set off the amount of Naterlin's overdue obligations against the deposit he then had in the bank, it was in ignorance of the true ownership of the moneys thus applied and,

therefore, was entitled to make the offset. Morse states the rule applicable to this contention as follows:

"When an agent or trustee deposits money of his principal or cestui, in his own name, in a bank to which he is indebted, and the bank in ignorance of the true ownership applied the money upon the debt, the owner can recover such money if it can be identified." 2 Morse on Banks and Banking (6th Ed.), Sec. 590.

But in the footnotes, he says:

"The weight of authority is to the effect that, if funds in which third parties have an interest are deposited in the individual name of the depositor in a bank which has neither actual notice nor notice of facts sufficient to put it on inquiry as to the true character of the deposit, it may apply the deposit to the payment of the individual debt of the depositor to the bank, and may do so whether or not it made any advances or otherwise changed its position on the faith of such deposit."

This court has never had occasion to pass upon the question as to the extent of the knowledge which will prevent a bank from rightfully applying to the payment of its own claims a deposit in which third parties have an interest, nor do we deem it necessary to do so now, since from a careful reading of the evidence we are convinced that the bank, when it made this application, if it did not have full knowledge as to the true character of the deposit, at the very least it had notice of facts sufficient to put it upon inquiry and that, if it had exercised ordinary diligence upon its part, it would have known that these funds did not belong to Naterlin and that they had been deposited for a specific purpose and that the plaintiffs in their dealings with Naterlin were dealing upon the faith of these particular funds and would have refused to have made the sales if they had not been relying thereon.

Again, on July 25, 1933, when Naterlin stated to the bank that the $400 it had been directed to deposit to his credit was to be deposited in the name of the Newport Fish Company Special Account, whether he explained to the bank the arrangements under which that money had been advanced and the terms of the contract under which the moneys had been advanced, as he said he did, the bank knew that the words "special account" were not *descriptio personae* but were a description of the fund deposited. It knew that these words imported the existence of some fiduciary relationship upon the part of Naterlin or the Newport Fish Company, and imparted notice to the bank of the character of the fund, and, in accepting the deposit, the bank impliedly, if not expressly, agreed that it would handle these funds in the manner that had been agreed upon by Naterlin and the San Juan Fishing and Packing Company. The bank, therefore, when it set off its notes against Naterlin's deposit, knew or should have known that Naterlin was not the true owner of the deposit and that the moneys had been deposited to enable him to purchase and pay for the fish he was about to buy for the San Juan Fishing and Packing Company. And when he later changed the name of the account and had the moneys later advanced deposited to his individual credit, in its subsequent dealings with him, the bank was charged with the same notice that it had previously obtained as to the true ownership of the funds.

However, the San Juan Fishing and Packing Company is not a party to this litigation and, so far as its rights are concerned, it has already received the fish for which it had contracted. It, therefore, has no ground to complain of the action taken by the bank whether wrongful or otherwise, since it no longer possesses any beneficial ownership in the funds. The only injured

parties, therefore, are Naterlin, who, although a defendant in the suit, made no appearance and is asking for no relief, and the plaintiffs, who are the holders of the checks and the only parties complaining.

As to the holders of the checks the bank contends that they have no remedy. Its argument is that the bank is not liable to the holders of the checks because of the doctrine announced in *Hunt v. Security State Bank,* 91 Or. 362 (179 P. 248), and *U. S. National Bank v. First Trust & Savings Bank,* 60 Or. 266 (119 P. 343), that a negotiable check does not operate as an equitable assignment of the fund on which it is drawn and the bank is not liable to the holder prior to acceptance or certification. The same rule is declared by statute for section 57-1006, Oregon Code 1930, provides:

"A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies to the check."

It is obvious, therefore, that if this is a suit on the checks alone then this suit cannot be maintained. This suit, however, was not brought upon the checks alone but upon the entire transaction of which the giving of the checks in pursuance of an agreement between the bank and Naterlin constituted a part and, therefore, we think the rule has no application to a suit of this character. We think that the rules applicable to this situation are stated in part by the two Kansas cases to which we will now refer. In *Goeken v. Bank of Palmer,* 100 Kan. 177 (163 P. 636), the court said:

"When Schuette sold the plaintiff's hogs, for which he had given only an unprotected check, the money which he received really belonged to the plaintiff and was subject to be claimed by him. And his right was

not lost by the deposit of the money with a bank which knew of its origin and was co-operating with Schuette. The rules that a bank is not bound by its oral acceptance of a check and that it is not liable to the payee of an unaccepted check have no application to this situation.''

Again, upon a second appeal in the same case reported in 104 Kan. 370 (179 P. 321), the court said:

''Although plaintiff was not a party to the agreement between Schuette and the bank, it was made in part for his benefit, and he was entitled to avail himself of the promise of the bank, although he may not have known that it was made. Harrison v. Simpson, 17 Kan. 508; K. P. Ry. Co. v. Hopkins, 18 Kan. 494; Griffith v. Stucker, 91 Kan. 47, 136 Pac. 937; Ballard v. Bank, supra [91 Kan. 91 (136 P. 935, L. R. A. 1916C, 161)].

''It is said that it does not appear that the bank had knowledge that the shipment of stock, the proceeds of which were deposited in the bank, included the stock sold by plaintiff. It is stated, and not denied, that there was a memorandum on the check showing that it had been given to the plaintiff for the purchase of 11 hogs from him by Schuette, and that in this way the check was identified and the bank notified, if notice was important, that the transaction came within its agreement with Schuette. Under the authorities cited it was not necessary to a recovery against the bank that there should have been a direct agreement between the bank and plaintiff that the check should be paid. The action was brought not upon the check alone, but upon the entire transaction, of which the giving of a check in pursuance of agreement constituted a part, and therefore, some of the rules contended for and which are applicable when action is brought on the check alone do not apply here.''

It will be noted that the language of the statute is ''a check of itself does not operate as an assignment'', etc. The words ''of itself'' import that, although a check in itself alone does not operate as an assignment,

yet under certain circumstances it may have that effect and, in that case, the payee may, of course, sue the bank for the misapplication of funds against which it was drawn upon its refusal to pay the check. The two Kansas cases just cited afford illustrations of circumstances under which that may be done. As said by Michie:

"Where a bank accepts a deposit from its customer under an agreement that it is for the purpose of creating a fund to meet the payment of a check to be issued subsequently to the making of such agreement, by the customer upon the bank, the bank is estopped from asserting, to the prejudice of the payee, that it had applied such funds to the payment of a demand note which it held against the customer." Citing *Joy v. Grasse,* 173 Minn. 289 (217 N. W. 365).

5 Michie, Banks and Banking, section 216, p. 404.

In the Minnesota case just cited, the court said:

"Under the provisions of G. S. 1923, sec. 7232, a check, of itself, does not operate as an assignment of funds in the bank to the credit of the drawer, yet, notwithstanding such provisions, the giving of a check together with the surrounding circumstances may amount to an assignment of such fund. Ballard v. Home Nat. Bank, 91 Kan. 91, 136 P. 935; Peoples Nat. Bank v. Swift, 134 Tenn. 175, 183 S. W. 725; Fourth Street Nat. Bank v. Yardley, 165 U. S. 634, 17 S. Ct. 439, 41 L. Ed. 855; Hove v. Stanhope State Bank, 138 Iowa 39, 115 N. W. 476; Gruenther v. Bank of Monroe, 90 Neb. 280, 133 N. W. 402."

"The natural equity", says Waterman on Set-off (2d Ed.), section 438, "to have mutual but unconnected demands between two parties who have been dealing with each other, set-off is, as a general rule, superior to the claim of any other creditor who has not dealt with the insolvent upon the faith of the specific fund

against which the right of offset is claimed''. ''In using deposits'', the authors say in 7 C. J., p. 632, sec. 307, ''made for the purpose of having them applied to a particular purpose, the bank acts as the agent of the depositor, and, if it should fail to apply it at all, or should misapply it, it can be recovered as a trust deposit.''

The evidence is undisputed that these plaintiffs dealt with Naterlin on the faith of the funds he had on deposit in the bank and, since the bank knew or should have known that they were dealing with Naterlin on the faith of such deposit, it had no right to set off Naterlin's obligations to the bank as against the deposit.

For these reasons the decree of the lower court will be reversed and a decree will be entered in favor of plaintiffs as prayed for in the complaint.

CAMPBELL, C. J., and BEAN and BAILEY, JJ., concur.