No. 26,905.

H. Humpert, *Appellee,* v. The Citizens State Bank of Talmadge, *Appellant.*

### SYLLABUS BY THE COURT.

1. Contracts—*Evidence—Sufficiency.* A finding that an agreement had been made to the effect that a bank would finance the operations of a grain dealer and pay checks issued by him in the purchase of grain where he had deposited the proceeds of the purchases in the bank by depositing sight drafts with bills of lading attached, in the resale and consignment of the grain, is held to have been established by sufficient evidence.

2. Banks and Banking—*Check Given in Pursuance of Agreement With Bank —Right of Holder to Sue on Check.* One who sold wheat and to whom the grain dealer's check upon the bank was given in pursuance of the agreement, is entitled to maintain an action against the bank which had received the proceeds of the wheat sold but had refused payment of the check.

3. Same—*Authority of President—Liability Where Contract Partly Carried Out.* Regardless of whether the president of the bank by whom the agreement was made had authority from the board of directors to make such an agreement, it is held that it was so far acted upon and carried out that the defense of lack of authority is not available to the bank. (Following *Ballard v. Bank,* 91 Kan. 91, 136 Pac. 935.)

Banks and Banking, 7 C. J. pp. 540 n. 30, 698 n. 45. Contracts, 13 C. J. p. 775 n. 91.

Appeal from Dickinson district court; CASSIUS M. CLARK, judge. Opinion filed December 11, 1926. Affirmed.

*Z. C. Millikin,* of Salina, for the appellant.

*George D. Bischoff, C. E. Rugh* and *Karl B. Rugh,* all of Abilene, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by H. Humpert against the Citizens State Bank of Talmadge to recover upon a check for $1,307.83, the purchase price of wheat sold by her to James Borin, and which is alleged the bank had agreed to pay but had refused payment upon presentation of the check. The plaintiff recovered and defendant appeals.

James Borin was a grain dealer, and it was in effect alleged that under an agreement the bank undertook to finance the grain operations of Borin, in this, that Borin was authorized to give his checks drawn on the bank to persons from whom he purchased grain, and should deposit the proceeds of sales in the bank by depositing there sight drafts drawn on consignees with bills of lading attached, and it was agreed that the checks would be paid out of such proceeds regardless of the state of Borin's account with the bank at the time. It was further alleged that Borin purchased 984 bushels of wheat from the plaintiff on November 15, 1924, and gave her his check on the bank for the purchase price, $1,307.83, and that he then deposited in the bank a sight draft with bill of lading attached, the proceeds of the wheat, but when the check given plaintiff reached the bank, payment was refused although the bank had previously received the proceeds of the wheat purchased by Borin. Instead of paying the check as it had agreed to do, it had converted the proceeds to the payment of a note which the bank held against Borin, a note that was not yet due. The bank denied the agreement as alleged by the plaintiff, but admitted the issuance of the check and the refusal of payment, and it further stated that the check was not paid because there were not sufficient funds placed to Borin's credit in the bank to meet the check.

The principal contention in the case was the existence of the agreement mentioned. Upon that question there was direct conflict in the evidence. Testimony was given by Higdon, the president of the bank, with whom the arrangement with Borin was made, to the effect that there was no agreement that Borin's checks were to be

paid without regard to his deposits in the bank, nor that he was to be favored or treated in any other way than an ordinary customer was to be treated. Borin, on the other hand, testified that his agreement with the bank was substantially as had been alleged by the plaintiff in her petition. The course of business with the bank and some accompanying circumstances tend to support Borin's version of the transaction. As the business was conducted, Borin's checks were paid as they came to the bank, in some cases before the proceeds of the sight drafts had been returned, and also when Borin's account was overdrawn. The books of the bank showed that many of the checks paid were entered as overdrafts. The jury found that the agreement relied on by plaintiff was made. To the finding in the affirmative, the jury added the words, "according to the routine of business." The added words were interpreted by the court as referring to the routine of business in the payment of the checks of Borin. In view of the fact that in four other answers the jury found that the agreement was made, we think the expression was correctly interpreted or at least that it did not have the effect of neutralizing the affirmative findings that the agreement was made. The agreement found to have been made between the bank and Borin was in part for the benefit of plaintiff and others from whom grain was purchased, and plaintiff was therefore entitled to avail herself of the agreement. A case similar in some respects is *Ballard v. Bank,* 91 Kan. 91, 136 Pac. 935, where the bank agreed with a customer, who was a stock dealer, that in purchasing live stock he might give checks in payment and the bank would pay them, if when they were presented the drawer should have resold the stock and deposited the proceeds in the bank. Upon that agreement stock was purchased by the dealer, checks on the bank were issued in payment of the stock, sales of the stock were made and the proceeds deposited in the bank. The checks were not paid when presented, but the funds on deposit were applied to the payment of a preexisting debt. It was held that the holder of the check could maintain an action against the bank and recover the amount of it although he did not know of the agreement between the bank and the stock dealer, and although nothing was said about it when the deposit was made. The court in that case made a quotation from another that is pertinent here:

"'All the authorities are agreed upon the rule of law declared in the above case, that a bank which accepts a deposit of money made by a depositor for a special purpose, under an agreement that it will pay the amount when needed

for that purpose, cannot rightfully appropriate such deposit to discharge the depositor's indebtedness to it.'" (p. 94.)

It appears that the day on which the plaintiff's check was refused Borin had $3,206.75 to his credit in the bank, but as already stated most of it was applied to the payment of a note of Borin's that was not yet due. Something is said to the effect that the bank had no notice of the outstanding checks given for wheat purchased, and it therefore had a right to treat the money as the property of Borin on general deposit, and to subject it to the payment of Borin's debt. So far as the matter of notice is concerned, it appears that the bill of lading, which included the plaintiff's wheat, indicated what it was given for, the destination of the wheat shipped, to whom it was consigned, and by whom it was shipped, including the quantity of wheat in bushels and weight. Even if the bank had no notice that the check was given for wheat, it would still be liable upon the basis of the agreement made between it and Borin. Authorities which are applicable to some features of the case are *Saylors v. Bank*, 99 Kan. 515, 163 Pac. 454; *Scoby v. Bank*, 112 Kan. 135, 211 Pac. 110. In the Scoby case it was said that —

"If the evidence shows that during the summer and autumn of 1918 there was an arrangement or understanding between Witham and the bank that he was to draw checks on the bank to pay for cattle purchased by him and that he was to deposit sight drafts with the bank drawn on the commission company for cattle shipments, and that the bank would honor and pay such checks regardless of the state of Witham's account, the defendant is liable." (p. 140.)

There is a contention that the president of the bank had no authority to make the agreement shown by plaintiff's evidence, but that the cashier is the officer authorized to administer the bank's financial affairs. The record discloses that the president, Higdon, was the officer who controlled and managed the affairs of the bank and had supervision over its daily affairs, but even if it is not regarded as a one-man bank, or if the authority exercised by Higdon had not been confirmed by the directors or sanctioned by long-continued usage, his arrangement with Borin had been so far acted on and carried out that the defense of lack of authority is not available to the bank. (*Ballard v. Bank*, supra.)

Some complaint is made as to a ruling on the admission of testimony as well as to the refusal of instructions requested and of those given, but in view of what has already been determined and the authorities cited, none of them afford ground for a reversal.

The judgment is affirmed.