No. 55,742

THE IOLA STATE BANK, *Appellant*, v. LORRAINE BOLAN, *et al.*,
*Appellees.*

(679 P.2d 720)

176

Opinion filed March 24, 1984.

*Charles N. Henson,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause, and *Anne L. Baker,* of the same firm, and *John Toland,* of Toland & Thompson, of Iola, were with him on the briefs for the appellant.

*Frank T. Forbes,* of Burlington, argued the cause, and *Dennis D. Roth,* of Buckles & Roth, Chartered, also of Burlington, was with him on the brief for the appellees.

*Barkley Clark,* of the University of Kansas School of Law, was on the *amicus curiae* brief for the Kansas Bankers Association.

The opinion of the court was delivered by

LOCKETT, J.: This case was originally a part of *Iola State Bank v. Biggs.* The action was separated into two cases. The first case was decided on appeal at 233 Kan. 450, 662 P.2d 563 (1983). The appellees in the present appeal intervened in the original Biggs case because checks issued to the intervenors from Biggs Feed and Grain, Inc. (Biggs) were dishonored by the drawee, Iola State Bank (Bank). The case was tried to a jury. After all the evidence was presented, the trial court directed a verdict in favor of the intervenors against the Bank in the sum of $26,663.14. The issue of whether punitive damages should be awarded to the intervenors was submitted to the jury. The jury awarded the intervenors punitive damages in the amount of $150,000.00. The Bank appeals.

Biggs operated a feed and grain elevator at Waverly, Kansas. Biggs purchased and sold grain. Biggs conducted its banking business with the Iola State Bank.

Biggs was indebted to the Bank by virtue of its promissory note dated February 13, 1981, in the sum of $294,000.00, with interest at the rate of 17% per annum. Biggs had never been financially able to make any payment of principal or interest on the note, which had become due in July, 1981.

Biggs was in the business of buying grain from farmers and selling grain to large dealers of grain. Joe Biggs, president of Biggs, checked the market daily to price the grain Biggs purchased. Upon the delivery of grain to the elevator, Biggs issued weight slips to the farmers/sellers, stating both the unit price and total price for the delivery. Frequently, it would be days or weeks before the farmers/sellers would be paid for the grain sold Biggs. Biggs would resell the grain it purchased to dealers. Biggs was entitled to the profits or losses suffered from the resale of the grain. When Biggs received payment for its sale to the large grain dealers, it would deposit the funds in its general checking account with the Bank. Biggs wrote the checks to pay the farmers/sellers from its general account with the Bank.

The Bank financed the grain operation since its inception in 1974. Security agreements were executed on May 20, 1975, and August 15, 1980, between Biggs and the Bank. The 1980 agreement provided the Bank with a security interest in all inventory of seed and grain and a purchase money security interest in all wheat, soybeans and feed grains owned or acquired by Biggs. The Bank filed a financing statement June 3, 1975, and a continuation statement on March 10, 1980, with the Secretary of State's office.

The farmers/sellers (intervenors) each sold grain to Biggs. Biggs issued checks, payable to the respective farmer/seller. The checks were presented to the Bank for payment from Biggs' account. When issued, Biggs' account at the Bank was sufficient to cover all the outstanding checks. From September, 1981, until December 31, 1981, proceeds from Biggs' resale of grain constituted 95% of all deposits in the account.

During an examination conducted in July, 1981, the Biggs indebtedness was criticized by the Bank examiners. The Bank examiners noted the total indebtedness and that 18 months had elapsed without any reduction in principal or interest. The Bank assured the examiners the Biggs matter would be taken care of within 90 days.

On August 14, 1981, Howard K. Gilpin, president of the Bank, had a conference with Joe Biggs. Biggs was informed the note was past due and was given 90 days from the bank examination, to the middle of October, to find other financing or a buyer for the business. The Bank discovered its deadline fell during the middle of the soybean harvest season. At Joe Biggs' request, Gilpin extended the Bank's deadline until November 15, 1981.

Biggs was unable to make payment by the deadline. On November 23, 1981, Ralph E. Smith, the Bank's agricultural loan officer, wrote Biggs demanding payment. No further extension would be granted by the Bank. Joe Biggs received the letter but failed to respond.

On December 7, 1981, checks issued by Biggs to the farmers/sellers for past grain sales to Biggs began to arrive at the Bank. The Bank took affirmative steps to collect Biggs' indebtedness due the Bank. Being advised by its legal counsel, the Bank set off Biggs' general checking account and applied the funds against the balance due on the Biggs' note. Checks received by the Bank for payment prior to setoff were dishonored because of insufficient funds in the Biggs' checking account. The checks had been written by Biggs between August 17, 1981, and December 2, 1981. On the same day as the setoff, the Bank filed suit against Biggs, and Joe Biggs and his wife individually, seeking payment of the balance due on the note and foreclosure of its security interest, and against the Bybees, Joe Biggs' in-laws who had guaranteed his note, as guarantors of the note.

The farmers/sellers intervened in the suit. The case was separated into two actions. This case was tried to a jury. After all of the evidence had been presented, the trial court directed a verdict in favor of the farmers/sellers for $26,663.14. The issue of punitive damages was submitted to the jury. The jury awarded the farmers/sellers punitive damages of $150,000.00. The Bank appealed.

Prior to the adoption of the Uniform Commercial Code, cash sales were governed by the "cash sale doctrine." A cash buyer did not receive title to the goods purchased until the seller was paid in full. A cash buyer who had not paid the seller in full could not pass title to a bona fide purchaser. A cash seller who was not fully paid for the goods retained title and could reclaim the goods from the purchaser. The cash sale doctrine restricted

the free flow of goods in commerce. The cash sale doctrine was abolished by the adoption of K.S.A. 84-1-101 *et seq.*

These are commercial transactions between the parties and governed by the provisions of the Kansas Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.* The UCC, when originally enacted, created substantial changes in the existing law. The underlying purposes and policies of the Code were to simplify, clarify and modernize the law governing commercial transactions. K.S.A. 84-1-102. The Act was to be liberally construed in accordance with its underlying purposes and policies. The principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy and other validating or invalidating cause remain unless displaced by a particular provision of the UCC. K.S.A. 84-1-103.

The Bank first contends the trial court erred in failing to sustain the Bank's motion for directed verdict. The Bank claims it had rightfully set off the balance in the Biggs checking account.

At the close of the testimony, both the Bank and the farmers/sellers moved for a directed verdict. The court denied the Bank's motion and granted that of the farmers/sellers. The court made the following findings:

"1. That upon the delivery of the grain by the Intervenors to Biggs, only a voidable title passed from the Intervenors to Biggs.

"2. That from the evidence presented in this case, no reasonable man—no reasonable and prudent man—could find otherwise than that the plaintiff bank had knowledge of the nature of Mr. Biggs' title.

"3. That no reasonable man could find that the bank could deny that it had knowledge of the nature of Mr. Biggs' title and of the nature of the proceeds in its hands. The stipulation sets out that 95% of the funds paid through that account were receipts from grain.

"4. That the bank willfully converted proceeds that were the property of the Intervenors.

"5. That the motion of the Intervenors for a directed verdict for the pecuniary damages sustained by them be sustained and judgment should be granted for each of them for the amounts set out in the stipulation.

"6. That the motion of the plaintiff be, and the same is hereby, denied.

"7. That the bank's setoff of the funds in the account—knowing the nature of the voidable title of Mr. Biggs and knowing the nature of those funds in its hands—was a willful act of the bank which subjects it to at least consideration by the jury of imposition of punitive damages for that improper setoff as against these Intervenors."

The trial court determined the farmers tendered delivery of the grain to Biggs. When the grain was delivered, it was Biggs' duty to accept the goods and pay for them. Payment was due the farmers on delivery of the grain to Biggs. Biggs' right to retain and dispose of the goods was conditional upon Biggs making the payment. K.S.A. 84-2-507. Biggs' payment by check completed delivery and was sufficient to transfer title, except payment by check is conditional and defeated between the parties by dishonor of the check on due presentment. K.S.A. 84-2-511. When the Bank dishonored Biggs' checks given for payment of the grain, the Bank voided title in Biggs and title returned to the farmers/sellers.

The trial court would be correct if Biggs had stored, not sold, the grain after delivery by the farmers/sellers. The trial court's solution does not take into consideration the intervention of third-party rights under the UCC. It failed to consider the rights of the Bank as a secured creditor against Biggs and the farmers/sellers under the Code. In addition, the court failed to consider that after Biggs was entrusted with the grain by the farmers/sellers, Biggs sold the grain in the normal course of business to third-party purchasers. The court's determination that Biggs' voidable title was defeated when the checks were dishonored and title to the funds returned to the farmers/sellers is incorrect under the facts of this case.

We agree the farmers/sellers' tender of delivery of the grain was conditional upon payment. K.S.A. 84-2-507. Biggs' payment by check completed the sale except Biggs' title could be defeated by the farmers/sellers upon dishonor of Biggs' checks. When sellers entrust goods to a person with voidable title, the person so entrusted has the power to transfer title to a good faith purchaser. Where the goods have been delivered under a transaction of purchase, the purchaser has such power even though the delivery was in exchange for a check which is later dishonored. K.S.A. 84-2-403(1) and (1)(b). Biggs, a merchant who deals in the sale of grain, was entrusted with the grain by the farmers/sellers. Biggs sold the grain in the normal course of business to good faith purchasers. K.S.A. 84-2-403(2). Prior to the Bank's dishonor of Biggs' checks, Biggs, with voidable title, transferred good title to good faith purchasers. Title to the grain passed to the good faith purchasers, Bunge Corporation, C G & F Grain Company, and Central Kansas Terminal.

The Bank claims under K.S.A. 84-2-403(1) it obtained title to the grain when the farmers/sellers entrusted the grain to Biggs. The Bank, a secured creditor under K.S.A. 84-2-403(4), was a purchaser in good faith for value thereby acquiring title to the grain held by Biggs.

The Bank cites authority which supports its position. The leading case of a battle between an unpaid seller and a third-party secured creditor is *Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir.), *cert. denied* 429 U.S. 834 (1976). *Samuels* involved the sale of cattle to an insolvent meat packer, Samuels. Cattle were delivered to the meat packer. Samuels slaughtered them and allowed the carcasses to chill for 24 hours. The carcasses were then graded by the United States Department of Agriculture and a price determined. Samuels then issued a check to the seller for the sales price. Before certain checks cleared the bank, Samuels declared bankruptcy. When notified of Samuels' bankruptcy, the drawee bank placed a stop order on Samuels' account and returned Samuels' checks to the sellers. The sellers sought to reclaim the proceeds of the sale of the carcasses held by the bank. The sellers were met by a secured lender of Samuels. The secured lender asserted it was a good faith purchaser since its security interest had attached to the carcasses upon their sale to Samuels. The court reasoned that a secured creditor who has an after-acquired interest fits within the broad definition of "purchase" under the Uniform Commercial Code and so qualifies as a good faith purchaser. For cases that follow *Samuels* or have used similar reasoning see: *United States v. Wyoming National Bank of Casper*, 505 F.2d 1064 (10th Cir. 1974); *Martin Buick v. Colo. Spgs. Bk.*, 184 Colo. 166, 519 P.2d 354 (1974); *B & P Lumber Co. v. First Nat. Bank*, 147 Ga. App. 762, 250 S.E.2d 505 (1978) (cites *Samuels*); *First Nat'l. Bk. of Elkhart v. Smoker*, 153 Ind. App. 71, 286 N.E.2d 203 (1972); *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299 (Iowa 1975); *Trust Co. v. Archives*, 10 N.C. App. 619, 179 S.E.2d 850 (1971); *Kennett-Murray & Co. v. Pawnee Nat. Bank*, 598 P.2d 274 (Okla. App. 1979); *Stumbo v. Hult Lumber Co.*, 251 Or. 20, 444 P.2d 564 (1968); *Villa v. Alvarado State Bank*, 611 S.W.2d 483 (Tex. Civ. App. 1981) (cites *Samuels*); *Holiday Rambler Corp. v. Morris*, 32 U.C.C. Rep. Serv. 1222 (D. Kan. 1981).

, K.S.A. 84-9-203, Kansas Comment 1983, authoritatively supports the Bank's position. The Comment provides in part as follows:

"The third criterion for attachment is that the debtor have 'rights in the collateral.' This is a restatement of the rule that you can't alienate what you don't own. . . .

"In many cases the secured creditor may turn to Article 2 of the UCC to measure the debtor's 'rights' with respect to collateral. For example, if a seller delivers equipment to the debtor on open account and then discovers that the buyer is insolvent, the seller can reclaim the equipment if he demands its return within ten days of delivery. 84-2-702(2). However, the seller's right of reclamation is cut off by a good faith 'purchaser' under 84-2-702(3), which would include the buyer's bank claiming the goods under Article 9. See the broad definition of 'purchase' in 84-1-201(32) and (33). Similarly, a cash seller of goods is subordinated to a bank financing the buyer if the check given for the goods is dishonored and the bank is in good faith. See 84-2-403(1); Central Nat. Bank of Mattoon v. Worden-Martin, Inc., 413 N.E.2d 539 (Ill. App. 1980); Gicinto v. Credithrift of America, [219 Kan. 766, 549 P.2d 870 (1976)]. In these cases, the debtor has no rights in the collateral as against the seller, but he does have the power to pass good title to the financing bank as good faith purchaser, so that the security interest attaches under this section. To this extent, 'title' as a relative concept is still alive under Article 9." Emphasis supplied.

The Bank had a security agreement with Biggs which included "a purchase money security interest in all wheat, soybeans and feed grains, and all accounts receivable now or hereafter acquired" by Biggs. The security agreement was properly perfected and remained in effect at the time of delivery of the grain to Biggs by the farmers/sellers. Under K.S.A. 84-9-203, attachment of the Bank's security interest occurs: (1) when there is an agreement that the interest attach; (2) the secured party has given value; and (3) the debtor has rights in the collateral, sufficient for secured party's rights to attach. The Bank had loaned $294,000.00 to Biggs. Biggs acquired voidable title to the grain under K.S.A. 84-2-403 which was sufficient for the Bank's lien to attach as a purchaser from Biggs, a cash buyer who later defaulted.

Is the Bank, with its security interest, a purchaser under the UCC? K.S.A. 84-1-201(33) defines a purchaser as "a person who takes by purchase." "Purchase" is defined as including "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift or any other voluntary transaction creating an interest in property." 84-1-201(32). The Bank was a purchaser.

Even though the Bank claims it obtained title to the grain held

by Biggs, the Bank's title was also voidable since it too had entrusted the grain to Biggs. Biggs' subsequent sale of the grain to good faith purchasers in the normal course of business defeated the Bank's title to the grain. The proceeds of the grain sale were identifiable cash proceeds. The Bank as a secured creditor had a right to the proceeds of the grain sales by Biggs. K.S.A. 84-9-306(1) and (3)(*a*). Under the Code, the Bank, a secured creditor, had a right to the money deposited in the Biggs checking account.

The farmers/sellers claim that the Bank was not a "good faith purchaser" under K.S.A. 84-2-403 and therefore acquired no title from Biggs. K.S.A. 84-1-201(19) defines "good faith" as meaning honesty in fact in the conduct or transaction concerned. The Bank would be a good faith purchaser if it is a secured creditor and has been honest in fact in the conduct or transaction between all the parties.

"The definition of 'good faith' in this subsection is subjective, and requires only honesty in fact. See also 84-1-203, which imposes on every contract or duty under the Code the obligation of good faith. Under 84-2-103(1)(b), the definition of 'good faith' is expanded to include an objective standard of 'reasonable commercial standards of fair dealing in the trade' when the party involved is a merchant. Two Kansas cases apply the Code's definition of 'good faith' in situations involving a holder in due course under Article 3. See Kaw Valley State Bank & Trust Co. v. Riddle, 219 K. 550, 549 P.2d 927 (1976); Cairo Coop. Exchange v. First Nat'l Bank of Cunningham, 4 K.A. 2d 458, 608 P.2d 1370 (1980), aff'd in part and rev'd in part 228 K. 613, 620 P.2d 805 (1980), modified 229 K. 184, 624 P.2d 420 (1981). In Baker v. Ratzlaff, 1 K.A.2d 285, 554 P.2d 153 (1977), the court applied the Code's good faith provisions to wrongful termination of a contract for the sale of goods. In North Central Kansas Production Credit Ass'n v. Boese, 19 U.C.C. Rep. Serv. 179 (D. Kan. 1976), the court stated that knowledge of suspicious circumstances did not amount to bad faith." K.S.A. 84-1-201, Kansas Comment 1983 (19).

In *In re American Food Purveyors, Inc.*, 17 U.C.C. Rep. Serv. 436 (N.D. Ga. 1974), a secured creditor's interest in afteracquired property was defeated by an unpaid seller because the secured creditor had not acted in "good faith." The secured creditor was not interested in the financial status of its debtor; it had loaned money in reliance on its perfected security interest in the debtor's assets. The secured creditor obtained information of the debtor's bad financial condition a short time prior to the debtor's bankruptcy petition being filed. After the debtor filed bankruptcy, the secured creditor claimed 400 cases of perch worth

184

approximately $12,000.00 as after-acquired property. The unpaid seller made claim, stating the secured creditor did not qualify as a good faith purchaser under the Code. The bankruptcy judge agreed, finding even if the Uniform Commercial Code would allow a secured creditor with an after-acquired property clause in its security agreement to prevail over a defrauded seller, the secured party could not be held to be a "good faith purchaser" where the evidence showed the secured party had notice of the financial plight of the debtor-buyer and had failed to act. As a matter of equity, it is essential that the secured party demonstrate that it acted in good faith and had no notice of debtor's insolvent condition in order to prevail over the reclaiming rights of the seller.

What was the Bank's conduct in regard to Biggs and the farmers/sellers in this transaction?

1. Biggs was indebted to the Bank on a promissory note dated February 13, 1981, in the sum of $294,000.00 with an interest rate of 17% per annum. Security agreements had been executed by Biggs and the Bank. A separate guaranty agreement had been executed between the Bank and the Bybees.

2. Biggs had never been able to make a payment on principal or interest due on the note.

3. The Bank knew that Biggs would not be financially able to pay the note. The Bank looked to the guarantors for payment under the guaranty agreement signed by the Bybees.

4. The Bank examiners had criticized the Bank when the examiners discovered 18 months had elapsed without a reduction of principal or interest on the Biggs note during an examination in July, 1981. The Bank assured the examiners the loan would be taken care of within 90 days.

5. August 14, 1981, the Bank president had a conference with Joe Biggs, president of Biggs, for the purpose of calling the loan.

6. The Bank extended the 90-day limitation for Biggs to pay the loan until after the harvest season, approximately five months.

7. The Bank knew funds set off in Biggs' account for payment of the note were funds from sales of grain harvested by the farmers.

8. The Bank knew how Biggs conducted the operations of purchasing and selling of grain.

Joe Biggs testified as to the following conversation between

himself and Mr. Gilpin, president of the Bank, on August 14, 1981:

"Q. Now, why had they called you down there, sir?

"A. Because I had a note that was due.

"Q. Did you have a discussion about that in their office?

"A. Yes, sure did.

"Q. Relate that discussion to us, would you, please?

"A. All right. Why Mr. Gilpin told me that they had been criticized by the bank examiners and they were going to make a claim against the Bybee Estate for their share of the note. And I said, 'All right,' and I said to him, I said, 'Well, does that mean that we're not going to be able to continue?' He said, 'No, we're going to make a claim against the Bybee family for their guarantee.' He said, 'We have always looked to Mr. Bybee, which I'm sure you're aware of, rather than you for the payment of these notes,' and he said, 'You will have this fall an opportunity to make some money which you haven't for a year or two,' because it looked like we were going to have some good crops, and he said, 'What we want to do is you go up there and make the money and run the elevator like you have.'

"I said to him, 'Well, if you don't want the note, nobody else will.' He said, 'Well, with the claim against the Bybee Estate and the reduction,' he said, 'I think it would probably be a good loan and a person wouldn't have any trouble getting it refinanced.' But he said, 'We will make the claim against the Bybee Estate,' And I said to him, 'Well, I'll go home and tell Mrs. Bybee.' He said, 'There's no need to do that. Our lawyers will do that.' I asked him the amount of the claim and he told me, and then we sat there and we visited.

"Then he said, 'You go up there and run this elevator in the fall like you have been and we'll take care of the claim and we'll go from there.' He said, 'Do you think you can be done by October 15th with harvest?' And I said, 'No,' I said, 'It depends on the weather would determine the harvest.' I said, 'We may not even be into harvest by October 15.'

"He said, 'What about November 15th?' I said, 'If it would be a nice dry fall where everybody could get their crops out, could be; but usually by December we're pretty well done by harvest, but,' I said, 'weather dictates how soon you get done by harvest. If you hit a dry year, it's over in a hurry; if it's a wet year, you drag it out for quite a while.' He said, 'You go up there and run your elevator and then we'll decide whether to liquidate or sell it or refinance it.' But he did say, 'You'll have an opportunity to make some money this fall that you haven't had in the prior years.'

"Q. Now, did he tell you at that time that November 15th was a firm deadline?

"A. No. That was a—

"Q. What was your understanding of the deadline that you had from your conversation with Mr. Gilpin?

"A. Was to run it through the fall harvest. He was asking about tentative dates and he said October 15th. And I said, 'Mr. Gilpin, we may not even be into harvest then because of the weather,' and he said, 'Well, that's 60 days.' I said, 'With the right kind of weather we could be done by November 15th, but,' I said, 'if it's a wet fall that could drag out.' But I said, 'We're usually done, like I say, in December sometime for sure because of the weather.'

"Q. Did you leave there and go down and run your elevator like you had in past years?
"A. Right, we sure did.
"Q. Operated the same way you normally did?
"A. We did."

On November 17, 1981, a further conversation occurred between Joe Biggs and Ralph Smith, vice-president of the Bank:

"A. On the 17th, Mr. Smith came down to the elevator and he and I—
"Q. What was going on that day when Mr. Smith came?
"A. We were buying and selling grain. In fact, we had semis in there. We were loading grain while Mr. Smith was there. And he asked me how we were doing, and I said, 'Well, we're still buying quite a little grain, five to seven thousand,' and it was starting to taper down and I thought in another two to three weeks I'd be over with it.
"Q. Is that what you told him?
"A. Right.
"Q. And what did he say to that?
"A. Well, he said, 'It sounds like it's been a good fall.' and he said that they had talked to the Bybee attorneys in Topeka and that he wanted to know if I knew anything. And I said no, that I was kind of in a bad position because I was a son-in-law and it really wasn't any of my business to a certain degree."

Had the Bank acted in "good faith" under the UCC? Neither the trial court nor the jury answered that question. The trial judge incorrectly found Biggs obtained voidable title under K.S.A. 84-2-507 and 84-2-511; that because the Bank dishonored Biggs' checks to the farmers/sellers, the Bank's action voided title in Biggs and title returned to the unpaid sellers, the farmers. In his findings of fact, the district judge erroneously determined under the reasonable man theory the Bank had knowledge that Biggs had no title in the funds, and that the Bank willfully converted property of the farmers/sellers when it dishonored Biggs' checks and seized the funds in Biggs' account. The trial court then required the jury to consider if punitive damages should be imposed. The jury determined the Bank was liable for punitive damages because of its conversion of the funds. The "good faith" issue was never determined by the trier of facts.

Here the district judge in his findings of fact and conclusions of law determined the Bank had failed to act honestly in fact and conduct thereby wrongfully converting property belonging to the farmers/sellers. We agree. The trial court's findings of fact determined as a matter of law the Bank had failed to act in "good faith" as required by the UCC. Since the Bank failed to act in

good faith, it was not a good faith purchaser, and its security interest did not attach against the farmers/sellers.

Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Here, after making such findings and conclusions, the trial court directed a verdict against the Bank for the wrong reason. In reviewing a directed verdict, we are to resolve all facts and inferences in favor of the party against whom the ruling is sought and if the evidence is such that reasonable minds could reach a different conclusion thereon the motion should be denied. *Stair v. Gaylord,* 232 Kan. 765, 659 P.2d 178 (1983). If the trial court reached the correct result, but for the wrong reason, the decision should still be upheld. *Strehlow v. Kansas State Board of Agriculture,* 232 Kan. 589, 592, 659 P.2d 785 (1983).

Since the Bank's security interest did not attach against the farmers/sellers, what is their relationship? Under the UCC a drawee is not liable to the holder of a check until it is accepted by the drawee. The UCC does not affect the Bank's liability to the farmers/sellers in contract, tort or otherwise by its failure to accept the check when presented for payment. K.S.A. 84-3-409. Under normal circumstances, when the farmers/sellers sold the grain to Biggs and Biggs' bank dishonors Biggs' checks payable to the farmers/sellers, in spite of sufficient funds and in absence of a stop order, the farmers/sellers had no direct recourse against Biggs' bank until the Bank accepted the check for payment. The UCC continues the prior law that there is no privity between the holder of a check and the drawee bank, assuming no certification or retention of the check beyond the midnight deadline.

The Bank contends, even if it is not entitled to the funds under the Uniform Commercial Code, its setoff was proper under the common law and K.S.A. 9-1206, which provides:

"Any bank shall have the right to set off any obligation or claim which it has, when the same is matured against any depositor."

Setoffs have been recognized in *Tuloka Affiliates, Inc. v. Security State Bank,* 229 Kan. 544, 627 P.2d 816 (1981); *Scharz v. Twin City State Bank,* 201 Kan. 539, 441 P.2d 897 (1968); *Tough v. Bank,* 89 Kan. 583, 132 Pac. 174 (1913); *Kimmel v. Bean,* 68 Kan. 598, 75 Pac. 1118 (1904).

10 Am. Jur. 2d, Banks § 666, pp. 635-36, states:

"It is a general rule that when a depositor is indebted to a bank, and the debts are mutual—that is, between the same parties and in the same right—the bank may apply the deposit, or such portion thereof as may be necessary, to the payment of the debt due it by the depositor, provided there is no express agreement to the contrary and the deposit is not specifically applicable to some other particular purpose."

Where a bank exercises an antecedent right of setoff, seizes a debtor's account, and seizes such funds in payment of a debt owed to the bank by the debtor, two different rules have evolved—the "legal rule" and the "equitable rule."

These were discussed in *Commercial Disc. Corp. v. Milw. Western Bank,* 61 Wis. 2d 671, 680-81, 214 N.W.2d 33 (1974), as follows:

"[8 A.L.R.3d at page 235] states that it is the well-settled rule that if a bank actually knows that sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to it. A bank is also denied the right of setoff where it has knowledge of circumstances sufficient to necessitate inquiry concerning the sums.

"However, the courts are divided about the bank's right to setoff funds belonging to a third person where the bank lacks knowledge of such claim or knowledge of facts requiring it to inquire about such sums. A considerable number of courts permit setoff in this situation.

"A growing number of courts, however, follow the 'equitable' rule that even if a bank lacks knowledge that the deposited sums belong to a third person and lacks knowledge of facts necessitating further inquiry, it cannot apply the funds against the debtor's obligation where it has not changed its position or has no superior equities. This rule, according to the annotation, is followed in Colorado, Indiana, Michigan, Minnesota, Nebraska, Oklahoma, Pennsylvania, South Carolina, South Dakota, and Texas. The federal courts are split, some applying the 'equitable' rule and others applying the rule that without knowledge a bank is entitled to setoff. This split is occasioned by conflicting interpretations of United States Supreme Court cases on the subject. In an early case the supreme court enunciated the equitable rule. In three later cases the supreme court denied setoff where the bank had actual knowledge. The lower federal courts have split in their interpretation of these cases. Those following the equitable rule have relied on the *Bank of Metropolis Case* [47 U.S. (6 How.) 212, 12 L.Ed. 409] and have confined the later cases to their facts." Quoted in *Tuloka Affiliates, Inc.,* 229 Kan. at 548-49.

In *Tuloka,* the bank, a secured creditor, was by express authority allowed to debit funds belonging to a third person placed in the debtor's account with the bank. This court in a 4-3 decision found since the bank had no knowledge that the funds belonged

to a third party, having acted in good faith, it was entitled to the funds. The dissent stated whether the bank had knowledge or not, the funds in the debtor's account belonged to a third party; since the funds of the third party were traceable, the bank was not entitled to the funds belonging to the third party.

A holder cannot sue the drawee bank for wrongful dishonor of an insolvent depositor's check just because the bank dishonors the check in order to protect its own interest. Where a bank knows sums deposited in the account of one of its depositors belongs to a third party, it does not act in good faith when it applies such funds of the third party against the depositor's debts to the bank. Under such circumstances the third party has an action directly against the bank for conversion of the third party's funds from the debtor's accounts.

In *Ballard v. Bank,* 91 Kan. 91, 92, 136 Pac. 935 (1913), a Jasper Stewart was engaged in buying and selling livestock. His custom was to purchase horses and mules, giving in payment his checks on the bank. Later he would borrow money from the bank upon his personal note to meet the checks. This plan became unsatisfactory to the bank, by reason of unsuccessful transactions made by Stewart, and it notified him that it would no longer loan him money. Stewart had to make other arrangements if he desired to continue business relations. Subsequently a conversation was had between the president of the bank and Stewart, which resulted in an agreement that Stewart might continue to buy stock, giving checks for payment, which would be paid by the bank, provided money for the purpose was furnished by Stewart from the sale of the stock he had purchased. Stewart bought stock from several persons, giving his checks. He made sales sufficient for the purpose and deposited the proceeds in time to meet the outstanding checks. The bank, however, refused to pay the checks, and applied the deposit to the preexisting debt of Stewart. Two separate actions were brought against the bank by holders of the checks. In each the plaintiff recovered.

In *Ballard,* the bank maintained plaintiff had no cause of action against it, because there was no privity between the bank and the holders. The negotiable instrument act provided specifically that a bank was not liable to the holder of an unaccepted check. G.S. 1909, § 5442. The court found a holder of a check cannot ordinarily maintain an action against the drawee, not-

withstanding it may have funds to pay the check when presented. Special circumstances, however, may give to the issuance of a check the character of a pro tanto assignment, thereby vesting in the holder a right of action upon it against the bank on which it is drawn. The action was not brought upon the checks alone but upon the entire transaction, of which the giving of the check forms a part.

In *Humpert v. Citizens State Bank*, 122 Kan. 101, 102, 250 Pac. 1077 (1926), action was brought by H. Humpert against the Citizens State Bank of Talmadge to recover upon a check for $1,307.83, the purchase price of wheat sold by her to James Borin. James Borin was a grain dealer. Under an agreement the bank undertook to finance the grain operations of Borin. Borin was authorized to give his checks drawn on the bank to persons from whom he purchased grain, and was required to deposit the proceeds of sales in the bank by depositing there sight drafts drawn on consignees with bills of lading attached. It was agreed that the checks would be paid out of such proceeds regardless of the state of Borin's account with the bank at the time. Borin purchased 984 bushels of wheat from the plaintiff on November 15, 1924, and gave her his check on the bank for the purchase price, $1,307.83. Borin then deposited in the bank a sight draft with bill of lading attached, the proceeds of the wheat. When the check given plaintiff reached the bank, payment was refused although the bank had previously received the proceeds of the wheat purchased by Borin. Instead of paying the check, as it had agreed to do, it had converted the proceeds to the payment of a note which the bank held against Borin. The Bank denied the agreement as alleged by the plaintiff, but admitted the issuance of the check and the refusal of payment, and it further stated that the check was not paid because there were not sufficient funds placed to Borin's credit in the bank to meet the check. Plaintiff recovered.

The *Humpert* court determined the agreement made between the bank and Borin was in part for the benefit of the others from whom grain was purchased by Borin. The plaintiff was entitled to avail herself of the agreement. A bank which accepts a deposit of money made by a depositor for a special purpose, under an agreement that it will pay the amount when needed for that purpose, cannot rightfully appropriate such deposit to discharge the depositor's indebtedness to it. 122 Kan. at 103-04.

Here the Bank had actual knowledge the funds belonged to the farmers/sellers. When questioned regarding the funds seized, Mr. Gilpin stated:

"Q.  When a check is issued in payment for grain, what is the value of that check on the day it's issued? Is that presentment?
"A.  No.
"Q.  In other words, is it not a fair statement to say that this check issued to the farmers is evidence of ownership of the funds that this check represents and he presents it at your bank or whatever bank it's drawn on to get his money?
"A.  You mean does a farmer own the money?
"Q.  Yes.
"A.  Yes, I would say so."

The Bank had actual knowledge of the manner in which Biggs conducted grain purchases and sales. The money in the account was from the sale of grain Biggs had originally purchased from the same farmers and then resold. The Bank had dishonored Biggs' checks drawn on the account for payment to the farmers. The Bank had actual knowledge the funds belonged to a third party. Where a bank actually knows the sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to the bank. The Bank's setoff was improper under K.S.A. 9-1206.

The Bank next contends the trial court erred in admitting evidence regarding the financial condition of the Bank since the award of punitive damages was precluded as a matter of law. The trial court had ruled that the conduct of the Bank in setting off the balance of Biggs' account constituted a willful and wanton conversion of the property of the farmers/sellers. The Bank's willful and wanton conduct subjected it to the imposition of punitive damages as a matter of law. The trial court determined the action of the Bank subjected it to consideration of the imposition of punitive damages by the jury. The trial court instructed the jury it may award an additional amount as punitive damages, then defined the terms "willful" and "wanton."

Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another's rights. The purpose of punitive damages is to restrain him and deter others from the commission of similar wrongs. In assessing punitive damages, the nature, extent and enormity of the wrong, the intent of the party committing it, and

generally, all the circumstances attending the particular transaction involved, including any mitigating circumstances which may operate to reduce without wholly defeating such damages, may be considered. *Will v. Hughes*, 172 Kan. 45, Syl. ¶ 10, 238 P.2d 478 (1951).

Normally there is no justification for assessing punitive damages against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort. Actions more reprehensible than mere negligence or mistake are required. *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 64-65, 643 P.2d 100 (1982).

The Bank, before exercising its right of setoff, consulted its attorney. Its counsel advised the proposed setoff was lawful in foreclosing the security interest. Punitive damages are not recoverable against a defendant who acts in good faith and under the advice of counsel. 22 Am. Jur. 2d, Damages § 253, pp. 346-47. However, whether or not an attorney has been apprised of all the facts underlying the client's proposed actions and those underlying facts are such that the client's actions would subject it to punitive damages, liability may not be avoided by claiming it acted upon the advice of counsel. The Bank's attorney had no knowledge it had acted in bad faith. Here the trial court found that the Bank had converted the funds in the Biggs' account which it knew belonged to a third party. Therefore, the Bank was subject to the imposition of punitive damages because of its conduct.

In awarding punitive damages, the jury considered the financial condition of the Bank. The Bank contends that the trial court erred in allowing the jury to consider its financial condition. When assessing punitive damages, the jury should not only consider the nature, extent and enormity of the wrong, the intent of the party committing the wrong, and all circumstances surrounding the transaction but it should also take into consideration any mitigating circumstances which may be considered to reduce the damages. In fixing an award of punitive damages, a jury may consider the amount of actual damages recovered, defendant's financial condition, and the probable litigation expenses, including attorney fees. *Sampson v. Hunt*, 233 Kan. 572, Syl. ¶ 12, 665 P.2d 743 (1983). Introduction into evidence of the Bank's financial status was proper.

The Bank next contends the award of punitive damages was excessive. The trial court erred in refusing to order a remittitur of damages. The jury awarded $150,000.00 punitive damages. The Bank contends $150,000.00 is excessive and disproportionate to the actual damages of $26,663.14 suffered by the plaintiffs.

It is difficult, if not impossible, to lay down precise rules to test the question of when a verdict of punitive damages is excessive. *Motor Equipment Co. v. McLaughlin,* 156 Kan. 258, 273, 133 P.2d 149 (1943). Neither the court nor the legislature has established a fixed ratio between the actual and punitive damages to determine whether punitive damages awarded are excessive.

The award of punitive damages here is approximately six times the award of actual damages. Where a charge of excessive verdict is based on passion or prejudice of the jury, but is supported solely by the size of the verdict, the trial court will not be reversed for not ordering a new trial, and no remittitur will be awarded unless the amount of the verdict, in light of the evidence, shocks the conscience of the appellate court. *Cantrell v. R. D. Werner Co.,* 226 Kan. 681, 686, 602 P.2d 1326 (1979). In *Sampson v. Hunt,* 233 Kan. 572, this court allowed an award of punitive damages 30 times the award of actual damages.

The trial court found the Bank had converted property of the farmers/sellers to its own use. The jury considered the attending circumstances, the nature of the acts and the intent of the Bank, any mitigating circumstances and the Bank's financial condition. The jury believed such sum necessary. The amount of punitive damages awarded was supported by the evidence and was proper.

The journal entry awards each intervenor actual damages in the amount claimed, plus prejudgment interest from December 8, 1981, to the date of judgment. The court awarded postjudgment interest at 15% per year until the judgment was paid. The postjudgment interest was calculated using the amount of the judgment and 10% prejudgment interest. The Bank contends it is error to award postjudgment interest on prejudgment interest, citing *Herman v. City of Wichita,* 228 Kan. 63, 612 P.2d 588 (1980); *First National Bank v. Bankers Dispatch Corporation,* 221 Kan. 528, 562 P.2d 32 (1977). We find these cases distinguishable. The case of *Jerry L. Phillips, Inc. v. Ratley,* 6 Kan. App. 2d 157, 627 P.2d 339 (1981), spells out how interest is

computed, relating to prejudgment and postjudgment interest. At page 162 of the decision, the Court of Appeals stated as follows:

"[W]e hold that the judgment of the trial court should be modified by allowing Phillips interest from September 20, 1978, on the principal sum due at the rate of 6% per annum (the rate then allowed by K.S.A. 16-201) until August 17, 1979, the date of judgment. Pursuant to K.S.A. 1980 Supp. 16-204(*b*), *the combined principal and interest owing on the date of judgment accrues interest thereafter* at the rate of 8% per annum through June 30, 1980, and at the rate of 12% simple interest per annum thereafter until paid." Emphasis supplied.

See also *Lippert v. Angle,* 215 Kan. 626, 627, 527 P.2d 1016 (1974).

45 Am. Jur. 2d, Interest and Usury § 78, p. 71, states:

"Although compound interest generally is not allowable on a judgment, it is established that a judgment bears interest on the whole amount from its date even though the amount is in part made up of interest, and this rule applies also to a decree in equity. As a consequence, compound interest may in effect be recovered on a judgment whereby the aggregate amount of principal and interest is turned into a new principal, or on a master's report computing the principal and interest due, which has been confirmed, since it is then in the nature of a judgment."

See 47 C.J.S., Interest & Usury § 24, pp. 70-71.

Prejudgment interest becomes a part of the judgment itself; and postjudgment interest relates only to the payment of the original judgment, and accordingly the postjudgment interest is computed on the entire amount of the judgment granted. The judgment interest in this case was properly calculated.

The judgment is affirmed.

PRAGER, J., concurs in the result.