(699 P.2d 566)

No. 56,470

DICK HATFIELD CHEVROLET, INC., *Appellee*, v. BOB WATSON MOTORS, INC., *Defendant,* and FIRST NATIONAL BANK OF KINGMAN, KANSAS, *Appellant.*

Opinion filed May 2, 1985.

*J. Stanley Hill* and *Robert E. Nugent, III*, of Branine, Chalfant, Hill & Nugent, of Hutchinson, for appellant.

No appearance for defendant, Bob Watson Motors, Inc.

*David R. McClure*, of Fettis and McClure, of Wichita, for appellee.

Before ABBOTT, P.J., PARKS and MEYER, JJ.

ABBOTT, J.: The First National Bank of Kingman, Kansas, (Bank) appeals from a judgment entered against it and in favor of Dick Hatfield Chevrolet, Inc., (Hatfield) in the amount of $8,005.90 plus interest and costs. The Bank contends it had perfected a security interest in a pickup truck which had been sold by Hatfield to the Bank's customer, Bob Watson Motors, Inc. (Watson Motors). The check given for the purchase price ($8,005.90) was dishonored by the Bank when it was presented for payment.

Two issues are presented on appeal. The trial court followed *Trapani v. Universal Credit Co.*, 151 Kan. 715, 100 P.2d 735 (1940), wherein it was held that transposed digits in the motor number did not impart constructive notice, and held in the instant case that a typographical error by which an extra digit was added to a 17-character identification number rendered an otherwise valid security agreement invalid. Thus, the first issue is whether or not *Trapani* is applicable to this case in light of the enactment of the Kansas Uniform Commercial Code by the legislature in 1965.

The second issue is not viable unless the Bank was a secured party. If it was, then we reach the question whether, as such, the Bank had priority over an unpaid cash seller (Hatfield) to the unit the Bank held as security.

Some background is helpful in understanding the legal issues. For reasons not germane to this appeal, the Bank was required by federal authorities to monitor problem loans. Watson Motors' transactions with the Bank were subject to those requirements. For that reason, and because it deemed itself insecure, the Bank had been monitoring Watson Motors' account on a daily basis for several months.

The Bank had floor planned Watson Motors' inventory and held a security interest on two pickups which were a part of the inventory. On August 13, 1981, a "dealer trade" was consummated between Hatfield and Watson Motors. A dealer trade is actually the sale of a vehicle by each dealer to the other with a check being exchanged for the full purchase price of each vehicle. The pickup sold by Watson Motors to Hatfield was one of the two pickups on which the Bank held a specific security agreement. The Bank knew the details of the trade in advance, approved the trade and released its security interest in the pickup transferred to Hatfield. The pickup purchased from Hatfield was substituted on the security agreement, at which time a digit (8) was inadvertently added to the identification number so that it became 1GCDC14H2BJ1583863.

At that moment, Hatfield had a 1981 pickup and Watson Motors' check for $8,005.90; Watson Motors had a 1981 pickup and Hatfield's check for $7,849.55. A dealer trade is not unusual. It is a common occurrence in the automobile business, and at that point each party was in basically the same position it was in before the trade. What followed is not what usually follows a dealer trade.

Watson Motors deposited the check it received from Hatfield, and the Bank used the proceeds to pay off a note Watson Motors owed the Bank. The following day, the check Watson Motors had given to Hatfield for $8,005.90 arrived at the Bank for payment, but by then there were insufficient funds in Watson Motors' account to pay it and it was returned to Hatfield. Three or 4 days later, Watson Motors ceased doing business and turned its business assets over to the Bank. Hatfield sued Watson Motors and the Bank to recover actual and punitive damages. The day after suit was filed and service made on the Bank, the Bank sold the pickup Watson Motors had received from Hatfield and applied the proceeds in the amount of $8,185.27 to Watson Motors' indebtedness to it.

The trial court held that the Bank did not acquire a valid security interest in the pickup Watson Motors received from Hatfield because of the error made in recording the identification number, that the Bank was not a good-faith purchaser for value, and that defendants were liable for the amount of the

insufficient fund check ($8,005.90) plus interest and costs. This appeal followed.

Counsel for Hatfield recognizes that the trial court is to be affirmed if *Trapani v. Universal Credit Co.*, 151 Kan. 715, applies. Absent certain exceptions, this court is duty-bound to follow Kansas Supreme Court decisions. One exception is when we are convinced for various reasons that the Supreme Court itself would not follow existing case law if it were faced with the set of facts before us. One reason is if the legislature has changed or has adopted statutory law that necessitates a different result. Kansas has adopted a Uniform Commercial Code since *Trapani* that substantially changed existing statutory and case law.

Under the Uniform Commercial Code, one of the requirements for a security interest to attach with respect to collateral is that the debtor sign a security agreement that contains a description of the collateral. K.S.A. 84-9-203(1)(a). The standard applied in determining the sufficiency of the description is addressed in the UCC at K.S.A. 84-9-110, which provides in pertinent part:

"For purposes of this article any description of personal property or real estate is *sufficient whether or not it is specific if it reasonably identifies what is described.*" (Emphasis added.)

The Official UCC Comment to 84-9-110 indicates that the purpose for easing the description requirement is that: "Under this rule courts should refuse to follow the holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called 'serial number' test." Similarly, the Kansas Comment 1983 notes that pre-UCC Kansas case law was changed by 84-9-110 and specifically gives *Trapani v. Universal Credit Co.*, 151 Kan. 715, as an example. Based upon these Comments, we conclude that the trial court's reliance on *Trapani* was unwarranted.

This result is supported by decisions from other jurisdictions. In the following cited cases, the various courts held that the vehicle identification numbers were unnecessary for a sufficient description, that a misdescription by an error in the number did not render the security interest invalid, or that such errors were not "seriously misleading." *Associates Capital Corp. v. Bank of Huntsville*, 49 Ala. App. 523, 274 So.2d 80 (1973); *Thomas Ford & c., Inc. v. North Ga. & c. Assn.*, 153 Ga. App. 820, 266 S.E.2d

571 (1980); *Still Associates, Inc. v. Murphy*, 358 Mass. 760, 267 N.E.2d 217 (1971); *City Bank and Trust Co. v. Warthen Serv. Co.*, 91 Nev. 293, 535 P.2d 162 (1975); *WyHy Federal Credit Union v. Burchell*, 643 P.2d 471 (Wyo. 1982).

In addition, the test for determining adequacy of description also applies to the collateral description required in financing statements under K.S.A. 84-9-402. The 1978 amendments to 84-9-402 permit generic descriptions of collateral consistent with the types or classifications of collateral defined in 84-9-109. This also complies with the test of 84-9-110. *Donald v. Madison Industries, Inc.*, 483 F.2d 837 (10th Cir. 1973); *In re Grey*, 29 Bankr. 286 (Bankr. D. Kan. 1983). Moreover, K.S.A. 84-9-402(8) excuses minor errors in the financing statement requisites so long as such errors are not seriously misleading to a third party searching the files. The legislature intended to be liberal in its requirements concerning the adequacy of collateral descriptions. Most recently, our Supreme Court has even gone so far as to hold that a collateral description was sufficient despite a misclassification of the collateral from the categories listed in K.S.A. 84-9-109. *John Deere Co. v. Butler County Implement, Inc.*, 232 Kan. 273, 655 P.2d 124 (1982). In that case, it was not fatal to the bank claiming a security interest in the collateral that the farm equipment held by an implement dealer for selling at retail was described as "equipment" rather than "inventory."

Although not necessary to our decision here, it does appear from the record that a security agreement was executed September 4, 1980, and that a corresponding financing statement was filed with the Kansas Secretary of State on September 8, 1980. These describe the collateral as inventory, including substitutions and after-acquired vehicles. Moreover, the security agreement reaches future advances. It would seem the dealer trade which took place and the subject vehicles of the trade would be covered under the earlier financing statement. Thus, it appears the later security agreement containing the error in the vehicle number is encompassed by the original financing statement. *Allis-Chalmers Cred. Corp. v. Cheney Investment, Inc.*, 227 Kan. 4, 605 P.2d 525 (1980).

We base our decision on the Bank's having satisfied the collateral description requirement. The trial court thus erred in finding that the additional digit of the vehicle identification

number was fatal to the Bank's claimed security interest.

Hatfield argues on appeal that Watson Motors had no rights in the vehicle received by Hatfield that could be subjected to a security interest, because the check drawn by Watson Motors to purchase the vehicle was dishonored. Hatfield relies on K.S.A. 84-2-511(3), which makes payment by check conditional and defeats payment if the check is dishonored. Under Hatfield's theory, Watson Motors' rights in the vehicle were terminated upon dishonor of its check, and therefore the Bank's security interest could not attach.

The Comments to 84-2-511(3) demonstrate the limiting effect of this section. The conditional payment under 84-2-511(3) affects the rights of the parties to the sales transaction—that is, the rights of Hatfield, the seller, and Watson Motors, the buyer. It has no effect on the rights of third parties taking from the defaulting buyer.

A defaulting buyer, such as Watson Motors, has the power to transfer greater title than it can claim under the Code, although such a transfer is admittedly wrongful as against the seller. K.S.A. 84-2-403(1)(b) provides:

"A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . the delivery was in exchange for a check which is later dishonored.'

Pursuant to this code provision, the defaulting buyer or debtor (Watson Motors) has voidable title or at least sufficient rights in the collateral for the Bank's security interest in after-acquired inventory to attach. *Iola State Bank v. Bolan,* 235 Kan. 175, 180, 679 P.2d 720 (1984); *Matter of Samuels & Co., Inc.,* 526 F.2d 1238 (5th Cir.), *cert. denied* 429 U.S. 834 (1976); *Martin Buick v. Color. Spgs. Bk.,* 184 Colo. 166, 519 P.2d 354 (1974); *Swets Motor Sales, Inc. v. Pruisner,* 236 N.W.2d 299 (Iowa 1975). Thus, the debtor, Watson Motors, had rights in the collateral and the Bank's security interest could attach, despite the dishonor of Watson Motors' check.

As Watson Motors' inventory financier, the Bank gave value each time it advanced funds to enable the purchase of vehicles. A $15,131.75 advance was used to purchase two pickups, including

one of the pickups involved in the dealer trade. Contrary to Hatfield's position, the law does not require that the loan proceeds be used by Watson Motors when it made payment by check for the Hatfield pickup.

In addition, the definition of "value" under the code encompasses preexisting indebtedness. K.S.A. 84-1-201(44). Therefore, so long as Watson Motors had an existing indebtedness to the Bank, value has been given. *Holiday Rambler Corp. v. First Nat. Bank and Trust,* 723 F.2d 1449 (10th Cir. 1983); *Matter of Samuels & Co., Inc.,* 526 F.2d 1238.

In summary, all three events necessary for the Bank's security interest to attach have been satisfied. The trial court erred in holding otherwise.

As discussed previously, the Bank's security interest could attach under this section despite the dishonor of Watson Motors' check. However, K.S.A. 84-2-403 only protects the good-faith purchaser for value. Thus, the ultimate question is whether the Bank acted in good faith in acquiring its security interest in the subject pickup.

Based upon the broad code definitions of purchaser and purchase, a party who takes by gift, voluntary mortgage, pledge or lien qualifies as a purchaser. K.S.A. 84-1-201(32), (33); *Matter of Samuels & Co., Inc.,* 526 F.2d at 1242; *Iola State Bank v. Bolan,* 235 Kan. at 182; *Martin Buick v. Colo. Spgs. Bk.,* 184 Colo. 166.

Hatfield contends the following conduct by the Bank is not indicative of good faith and therefore the Bank does not qualify as a good-faith purchaser under K.S.A. 84-2-403. The Bank authorized the dealer trade between Watson Motors and Hatfield, knowing the parties would be exchanging checks. The Bank made the determination the check would be dishonored. The Bank did not notify Watson Motors of the overdraft. Finally, the Bank monitored Watson Motors' account very closely and was aware of Watson's financial difficulties.

The trial court concluded the Bank was not a good-faith purchaser. The court particularly mentioned the Bank's act of selling the collateral one day after Hatfield filed suit against the Bank and Watson Motors for return of the collateral or the amount of the check that had been dishonored.

Under the code, good faith means "honesty in fact in the conduct or transaction concerned." K.S.A. 84-1-201(19). This

court has interpreted this to require no actual knowledge or participation in any material infirmity in the transaction. *Cairo Cooperative Exchange v. First Nat'l Bank of Cunningham,* 4 Kan. App. 2d 458, 464, 608 P.2d 1370, *aff'd in part and rev'd in part* 228 Kan. 613, 620 P.2d 805 (1980).

Under this court's standard of review, its function is to determine whether the trial court's findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Iola State Bank v. Bolan,* 235 Kan. at 187.

The Bank's awareness of Watson Motors' financial difficulties and the daily monitoring of its account balance, standing alone, are not sufficient actions to constitute bad faith. Hatfield alleges that the Bank knew of Watson Motors' insolvency at the time it approved the dealer trade. The record does not support this contention. Rather, the Bank knew Watson Motors was struggling financially. Moreover, the Bank did not regularly participate in dealer trades. The Bank's authorization, however, was needed by Watson Motors because the Bank had to release its security interest in the traded vehicle and release the vehicle title to the acquiring dealer. In short, the Bank's activity does not rise to the level of participation in Watson Motors' business to have sufficient knowledge to constitute bad faith such as was found in *Monsanto Co. v. Walter E. Heller & Co.,* 114 Ill. App. 3d 1078, 449 N.E.2d 993 (1983).

Likewise, the Bank's conduct in dishonoring Watson Motors' check and having knowledge that Hatfield was unpaid when it sold the collateral does not constitute bad faith. The Bank was not obligated to cover Watson Motors' overdrafts, even though this practice may have occurred in the past. The law does not require the Bank to extend more credit to Watson Motors to save Hatfield a loss. *Matter of Samuels & Co., Inc.,* 526 F.2d 1238; *Berga v. Amit Intern. Trade, Ltd.,* 511 F. Supp. 432 (E.D. Pa. 1981). The decision to dishonor Watson's check was entirely reasonable and the record does not support a conclusion of bad faith by the Bank in its determination of which checks to pay. The Bank did not guarantee Hatfield that Watson Motors' check would be paid. *Burk v. Emmick,* 637 F.2d 1172 (8th Cir. 1980).

Plaintiff's exhibit No. 7 establishes that from July 31, 1981, until the day Watson Motors' check was returned, there were

only two days that Watson Motors had insufficient funds in its bank account to pay a check in the amount of $8,005.90.

The Bank's disposal of the Hatfield pickup after Hatfield filed suit, which was particularly cited by the trial judge, is not bad-faith conduct. Knowledge by a secured party that a seller has not been paid for products purchased by its debtor does not mean that the secured party lacks good faith. *Shell Oil Co. v. Mills Oil Co., Inc.*, 717 F.2d 208 (5th Cir. 1983). Lack of knowledge of third-party claims is not required to achieve a good-faith purchaser status. In addition, as pointed out by the Bank, the subsequent sale of the inventory by the Bank is wholly irrelevant to the Bank's ability to acquire good-faith purchaser status. Good faith is pertinent to acquiring purchaser status. Here the pickup was sold for more than the amount of the insufficient fund check. If the Bank had retained possession of the pickup it would not be worth that much today. Its disposal of the pickup was reasonable.

Thus, the Bank qualified as a good-faith purchaser and was entitled to the protection of 84-2-403. The Bank, as an inventory financier, has a perfected security interest in the Hatfield pickup.

In the trial court, the Bank and Watson Motors were found jointly and severally liable to Hatfield for the amount of the dishonored check ($8,005.90) drawn by Watson Motors. Judgment against the Bank is contrary to the legal authority regarding priority.

A party in the Bank's position, an inventory financier or floating lienor, occupies a favorable and privileged position in determining priority to collateral. B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code, § 10.6 (1980). The Bank's priority extends over unpaid cash sellers such as Hatfield. The leading case recognizing an inventory financier's priority to collateral is *Matter of Samuels & Co. Inc.*, 526 F.2d 1238. The *Samuels* decision is consistent with many jurisdictions presented with the same issue. *Holiday Rambler Corp. v. First Nat. Bank and Trust*, 723 F.2d 1449; *United States v. Wyoming National Bank of Casper*, 505 F.2d 1064 (10th Cir. 1974); *General Elec. Credit Corp. v. Tidwell Industries*, 115 Ariz. 362, 565 P.2d 868 (1977); *Martin Buick v. Colo. Spgs. Bk.*, 184 Colo. 166; *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299.

Kansas is in accord in subordinating the unpaid cash seller's rights in the collateral to those of a bank that is financing the defaulting buyer and is a secured creditor. *Iola State Bank v. Bolan,* 235 Kan. 175. We conclude that the priority rules enunciated in Bolan control the instant case and that the trial court erred in entering judgment against the Bank.

Reversed.